Stephen Wayne **ANDERSON,**
Petitioner–Appellant,

v.

Arthur **CALDERON, Warden,**
Respondent–Appellee.

No. 98–99024.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 5, 2000

Filed Nov. 17, 2000

Margo A. Rocconi, Federal Public Defender's Office, Los Angeles, California; Robert S. Horwitz, Law Offices of A. Lavar Taylor, for the petitioner-appellant.

Gil P. Gonzalez, Office of Attorney General, San Diego, California, for the respondent-appellee.

Before: TROTT, FERNANDEZ, and McKEOWN, Circuit Judges.

TROTT, Circuit Judge:

Elizabeth Lyman was an 81 year old retired piano teacher. She lived by herself on Church Street in Bloomington, San Bernardino County, California. About one hour after midnight on Monday, May 26, 1980—Memorial Day—petitioner Anderson, a 26–year old escapee from Utah State Prison, broke into Mrs. Lyman's home; cut her phone line with a knife, and shot her in the face from a distance of 8 to 20 inches with his .45 caliber handgun as she lay in her bed. Anderson then covered her dead body with a blanket, recovered the incriminating expelled casing from the hollowpoint bullet that killed her, and methodically ransacked her house for money. He found less than $100. Next, Anderson sat down in Mrs. Lyman's kitchen to eat a dinner of noodles and eggs. His meal was interrupted, however, by deputy sheriffs called to the scene by a suspicious neighbor who had been awakened by barking dogs and had seen Anderson in Mrs. Lyman's house through a window. The deputies arrested Anderson at 3:47 a.m. and took him to the San Bernardino Sheriff's Substation in Fontana.

Enter San Bernardino County Sheriff's Department Homicide Detail Detectives Wes Daw and Dennis O'Rourke. Daw and O'Rourke promptly advised Anderson of his *Miranda* rights, after which he freely and fully confessed to the burglary of Mrs. Lyman's house and to shooting her. He repeated his confession three hours later at Lyman's home during a filmed reenactment of the crime. Two days later, on May 28, he was interviewed at 6:55 p.m. by Dr. Robert Flanagan, a psychiatrist employed by the California prison system, to whom he repeated his confession and who found him to be sane, oriented, and sober at the time of the offense, and competent to stand trial. Because of the holiday and other events, seventy-six hours elapsed between Anderson's arrest and his arraignment on May 29, 1980, at 1:10 p.m.

A San Bernardino County jury convicted Anderson of first degree felony murder with special circumstances, finding that the murder of Elizabeth Lyman occurred during a burglary. The jury sentenced him to death. The California Supreme Court affirmed the convictions but granted his request for a new special circumstances/penalty phase trial on the ground that the jury had erroneously not been asked (as required by California law) to determine whether the homicide was intentional. *See People v. Anderson,* 38 Cal.3d 58, 61, 210 Cal.Rptr. 777, 694 P.2d 1149, 1151 (1985). Such a finding was necessary at that time before a defendant could be eligible for capital punishment. A second jury retrying special circumstances and the penalty phase of Anderson's case years later concluded in 1986 that the murder of Elizabeth Lyman was intentional and again sentenced him to death.

Eventually, having failed in state court to undo either his conviction or his final death sentence, *see People v. Anderson,* 52 Cal.3d 453, 485, 276 Cal.Rptr. 356, 801 P.2d 1107, 1125 (1990), Anderson went to federal district court with a petition for a writ of habeas corpus. After lengthy proceedings, which included an exhaustive evidentiary hearing, his numerous claims were denied. He now comes to us on appeal from the denial with claims aimed at both his conviction and his sentence. The claims are as follows:

1) That the State violated the disclosure rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to turn over to Anderson's trial lawyers a brief tape-recorded interview taken on the day of his arrest in which he alleges he invoked his right to remain silent.

2) That the State violated his Fourth Amendment right by failing promptly

to arraign him as required by *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991).

3) That the State trial court made improper comments to the penalty phase jury about the procedural history of the case, including comments that Anderson had previously been sentenced to death, but that the sentence had been overturned on appeal.

4) That the State trial court erred in failing to instruct the guilt-phase jurors on lesser included offenses.

5) That he was the victim of ineffective assistance of counsel.

6) That the penalty phase jurors prematurely began deliberations.

7) That the federal district court erred in refusing to limit the State's use of privileged materials to federal habeas corpus proceedings.

This court has jurisdiction pursuant to 28 U.S.C. § 2253, and we affirm the judgment of the district court.

# I

## *Brady v. Maryland*

■ In *Brady v. Maryland,* the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. The duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); and the duty encompasses impeachment evidence as well as exculpatory evidence. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. 3375; *see also Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

■ Because *Brady* does not require bad faith on the part of the prosecution for a violation of due process, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Kyles,* 514 U.S. at 438, 115 S.Ct. 1555. In order to comply with *Brady,* therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437, 115 S.Ct. 1555.

■ We use a three-part test to measure whether a failure to disclose amounted to a *Brady* violation: (1) the evidence at issue must be "favorable" to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the suppressed evidence must be "material" under state law to the accused's guilt or punishment—i.e., prejudice must have ensued. *See Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *see also United States v. Cooper,* 173 F.3d 1192, 1202 (9th Cir.1999).

*Brady* comes into play in this case because Daw and O'Rourke had a brief tape recorded conversation with Anderson between 7:04 a.m. and 7:07 a.m. on the day of his arrest, but neither the conversation, nor the existence of the tape, nor the substance of the discussion were disclosed to Anderson's attorneys until April 1993, some 13 years after the murder of Elizabeth Lyman and long after Anderson's trials and second sentence to death. The brief conversation was occasioned by Anderson's request during his initial confession to the Lyman crimes to talk to Daw and O'Rourke about other crimes which occurred not in California, but in Utah. Anderson argues that the unrevealed taped conversation demonstrates that he invoked his right to remain silent about two separate murders in Utah to

which he confessed two days later to Salt Lake County Officers, and which were then used by the State at the penalty phases of his trial to convince the jury to sentence him to death. He claims that the taped conversations contain exculpatory evidence that was both favorable and material because what he said to the detectives about his willingness to talk to Utah officials could have been used under California law to suppress those damaging confessions, and that without those damaging confessions, his sentence in this case might well have been different.

To determine whether Anderson's *Brady* claim has merit, we must start with the salient facts. They are as follows:

Anderson was arrested at 3:47 a.m. on Memorial Day. He was transported to the Sheriff's Fontana Substation at 5:15 a.m. At about 6:00 a.m., Daw and O'Rourke fully advised him of his Miranda rights. He waived his rights and confessed to the Lyman crimes.

At some point during this process, and after he had been advised of and waived his Miranda rights, Anderson volunteered that he wanted to tell the detectives about other murders he had committed in Utah, unsolved crimes about which Daw and O'Rourke had no knowledge. They asked him to hold off until they talked to him about the Lyman homicide. The Lyman interview ended at 6:45 a.m. Then, at 7:04 a.m., Daw and O'Rourke readvised Anderson of his rights on a fresh tape and gave him an opportunity to talk about the murders he had tried to tell them about earlier. Because what was said is central to our analysis of both Anderson's *Brady* claim and his claim that his subsequent confessions were the product of an unreasonable delay in his arraignment, we lay out the entire taped interview as it occurred on that morning over 20 years ago:

O'Rourke: All right, the time is zero-seven-oh-four hours: Date: 5/26/80. We are at the Fontana Substation ... Present reporting officer Sergeant Dennis M. O'Rourke, Detective Wes Daw and Stephen Anderson.... Steve, we just interviewed you reference another case and ... you indicated that you wanted to talk to myself and Detective Daw about ... some other cases occurring in other jurisdictions and basically, I would assume they were in Salt Lake City, Utah; is that correct?

Anderson: ... Yes.

O'Rourke: All right. Prior to ... discussing those incidents with you, which ... myself and Wes Daw had no personal knowledge of any of those cases involved ... I want to again advise you of the same rights that I just advised you ... reference our case. All right. You have the absolute right to remain silent. Anything you say can and will be used as evidence against you in a court of law. You have the right to consult with an attorney, to be represented by an attorney, to have an attorney present before and during questioning. If you cannot afford an attorney, one will be appointed by the court free of charge to represent you before and during questioning, if you desire. All right, Steve, do you understand the rights I've just explained to you?

Anderson: Yes.

O'Rourke: All right. With those rights in mind, are you willing to talk to myself and Detective Daw about the cases that you ... have knowledge of in Salt Lake City, Utah?

Anderson: hhhh ... ah.... Like ... ah ... I think I oughta think about it.

O'Rourke: Okay.

Anderson: I mean I'm not ... playin' around right now, I just ... got to thinkin' about it, you know, what you told me ...

O'Rourke: Um-hmm.

Anderson: ... Right now I better wait and see what they got—

O'Rourke: Of what who has?

Anderson: Salt Lake.

O'Rourke: Okay. Fine.

Anderson: I mean ah ... I didn't mean to run you on no blind or game or nothin' but ah ... somethin' clicked when you was talkin', you know, maybe I oughta wait.

O'Rourke: Okay. All right, just ... briefly, let me run something by you so that I—I'm straight in my mind ... that ... you had indicated ah ... about a—some sort of a contract hit up in Salt Lake City, Utah. Ah ... Our intentions at this point, Steve, are, we're gonna ... we'll be in contact with Salt Lake City—

Anderson: Uh-huh.

O'Rourke: —or whoever—but we'll have a teletype out on you some time today—

Anderson: Uh-huh.

O'Rourke: —later this afternoon ... using ... the various names that you've used ... ah ... and the weapon that we have which ... apparently is a weapon used in our ... h-homicide will be test-fired here and will be available to other agencies, you know, as far as comparison ... bullets—whatever they have—I don't know. Neither does Wes.

Anderson: Uh-huh.

O'Rourke: We have no knowledge ... of any of the other cases ... and ... the only reason I'm talking to you now—and Wes is—is the fact that you indicated, you know, you wanted ta ... tell us everything and I told you that hey, we were willing to sit and listen, you know, to whatever you wanted to tell us. I still am.

Anderson: Ah.

O'Rourke: —as far as that goes. But again, that's a decision *you* have to make and ... we're not gonna try to make it for ya, or force you in any *way* to make *any* statement to us at all.

Anderson: I know.

O'Rourke: But if you feel that you better wait until you find out what they have, that's—that's totally up to you.—

Anderson: I—Right now I'm gonna ... well, it's—it's ... I think right now ... silence is virtue because ... well, it's ... just better right now for me to wait.

O'Rourke: Okay. All right. We're gonna terminate this interview.

Both Daw and O'Rourke understood Anderson's statements about wanting to see what Salt Lake City authorities had before he continued to talk about crimes in Utah as a request to talk to authorities from that jurisdiction. [ER 2451; SER 2076] Daw testified that he did not interpret what Anderson said as an invocation of his right to remain silent. [ER 2450] Daw said that he "reviewed [sic] it as a conditional response that he would talk to us later." [ER 2455] Accordingly, O'Rourke called the Salt Lake City Police Department, which referred him in turn to the Salt Lake County Sheriff's Office and eventually to Sergeant Jerry Thompson of

that agency. Thompson was familiar with Anderson as a walk-away escapee from Utah State Prison, and had knowledge of the two Utah killings for which Anderson claimed responsibility.

Two days later, on May 28, 1980, Thompson traveled to San Bernardino to talk to Anderson. Their taped conversation began shortly after noon, and it opened with the usual ritual:

> This is Detective Jerry THOMPSON of the Salt Lake County Sheriff's Office. The date is 5–28 of 1980, and the time is 1216 hours. I am conducting an interview with one Steven Wayne ANDERSON, DOB is July 8th of '53. He also uses the alias of Felix SMITH. Present during the interview is Tom GLASSER from the District Attorney's Office from San Bernardino, California, Sergeant Dennis O'ROURKE from the San Bernardino County Sheriff's Office, and Detective Wes DAW from the San Bernardino County Sheriff's Office.
>
> Q. At this time, Felix, I know you been advised of your Miranda rights, but I'm gonna advise 'em to you again for your own protection. You have the right to remain silent. Anything you say will be used in court as evidence against you. You're entitled to talk to an attorney now and have him present now or at any time during the questioning. If you cannot afford an attorney, one will be appointed for you without cost. Do you desire to consult with an attorney first or have one during the interview?
>
> A. No.
>
> Q. Okay, having your rights in mind, do you desire to go ahead and talk to me?
>
> A. Yes.
>
> Q. Has anyone threatened you or promised you anything to make this statement?
>
> A. No.

Following this advisement and waiver of both the right to counsel and the right to remain silent, Anderson confessed—in narrative form punctuated by clarifying questions—to two homicides. The first homicide was what Anderson described as the contract killing of Timothy Glashien, a killing commissioned by drug traffickers after Anderson's walkaway escape from Utah State Prison. Anderson said he shot Glashien four times with the same handgun he had used to kill Elizabeth Lyman, and that he was paid $1,000 for his efforts. Scientific tests later confirmed his statements about the weapon he used.

The second homicide for which Anderson took credit was the earlier stabbing death in Utah State Prison of Robert Blundell, fellow inmate for whom Anderson said he had no use. Anderson got into an argument with Blundell in the kitchen area over Blundell's reputation as a snitch. Blundell responded to Anderson with a sexual threat, after which Blundell left the area "to get some milk for his coffee." Anderson picked up a kitchen knife, followed Blundell, and stabbed him to death. Anderson explained to Thompson that he killed Blundell because "he got in my face at the wrong time and probly [sic] caught me in the wrong mood you might say." [Def–00096]

At the conclusion of this interview, Anderson explained his motive and intent for initiating this contact with Utah authorities and for confessing to these additional homicides:

> Q. (Thompson): . . . Have I or has anyone else threatened you in order to make this statement or promised you anything?
>
> A. (Anderson): No.
>
> Q. You done it on your own *free will?*
>
> A. Yes.
>
> Q. After having your rights in mind?
>
> A. Yes. I'd just like to say that, uh, I did, I uh, made these statements *simply to, uh, clear up the fact that a lot of people were suspected of the crimes that shouldn't have been suspected.* And that I had been informed of it by various people

that it should be cleared up because they didn't have anything to do with it. And that's my *main purpose* here with these crimes in Utah. (emphases added).

Anderson asserts that the 7:04 a.m. conversation he had with Daw and O'Rourke contained both favorable and material evidence that he could have used under California law to suppress his confessions to the Glashien and Blundell homicides. He argues that the failure to notify his attorneys of this information prior to his trial violated the *Brady* rule. We respectfully disagree.

The California case Anderson primarily relies on to establish both the favorability and the materiality of this evidence is *People v. Pettingill,* 21 Cal.3d 231, 238, 145 Cal.Rptr. 861, 578 P.2d 108 (1978). *Pettingill* in turn relied on the seminal California case of *People v. Fioritto,* 68 Cal.2d 714, 719–720, 68 Cal.Rptr. 817, 441 P.2d 625 (1968), which spawned the so-called *"Fioritto* rule." Under *Pettingill* and the *Fioritto* rule, once a suspect indicated that he wanted to assert his privilege against self-incrimination, all police-initiated custodial interrogation must cease; and, any statement made thereafter was deemed to be involuntary and inadmissible, even if preceded by full *Miranda* warnings and waivers. *See Pettingill,* 21 Cal.3d at 240, 145 Cal.Rptr. 861, 578 P.2d 108.

*Pettingill* explicitly rejected the rule established by the Supreme Court in *Michigan v. Mosley,* 423 U.S. 96, 104–06, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), which allows the reinitiation of questioning by police after a suspect invokes his rights so long as certain factors are present:

1) The original interrogation was promptly terminated;

2) The interrogation resumed only after a significant passage of time;

3) The suspect was given *Miranda* warnings again;

4) A different officer resumed the questioning; and

5) The subsequent interrogation was limited to a crime not the subject of the first interrogation.

*Pettingill,* 21 Cal.3d. at 247, 145 Cal.Rptr. 861, 578 P.2d 108.

█ The State urges us to follow *Mosley* in deciding this case, but the State's reliance on *Mosley* is plainly incorrect. Although federal habeas corpus concerns itself with violations of the Constitution and federal law, the *Brady* rule relies for its determination of both favorability and materiality on *state* law, not federal law; and the California Supreme Court in *Pettingill* made it clear that it was rejecting the *Mosley* approach in favor of a stricter standard based not on the Constitution of the United States, but on the Constitution of the State of California. *Id.* at 247–48, 145 Cal.Rptr. 861, 578 P.2d 108. Thus, to decide whether the undisclosed information was favorable and material, we must look to the controlling law of California. *See Brady,* 373 U.S. at 88–91, 83 S.Ct. 1194; *Fryer v. Nix,* 775 F.2d 979, 984 n. 5 (8th Cir.1985).

█ There are two insurmountable problems with Anderson's *Brady* claim. First, he formally presented it to the Supreme Court of California in his habeas petition, and it was rejected on January 3, 1996. The factual and legal essence of the claim he brings to federal court was designated in his brief to California's highest court as claims E., H., and I. and supported by Exhibits 28 and 29, a transcript of the May 26, 1980, disputed conversation, and a tape recording of it, respectively. After taking judicial notice "of the appellate record in the underlying appeals," the California Supreme Court denied claims E. H., and I "on the merits." Thus, to the extent that a *Brady* claim looks to the relevant state law for answers to certain critical questions, we have those answers in an authoritative determination from the Supreme Court of California itself: On the merits, Anderson's claim that the undisclosed and newly-discovered evidence vio-

lated *Brady* in that it was both favorable and material is groundless.

■ The second problem with Anderson's *Brady* claim is that our independent review of it, which we undertake only because of its close connection to his delayed arraignment claim, clearly demonstrates to us—as it did to the district court—that Anderson did not invoke his right to silence during the May 26, 1980, conversation in question. The district court factually determined after hearing all the evidence that Anderson simply told the officers that he would wait to talk to Salt Lake City authorities, not that he had changed his mind and decided after all not to follow through on his volunteered desire to reveal what he had done in Utah. To quote the district court,

Anderson clearly conveyed a willingness to discuss other crimes if a condition was met, i.e. he found out what information the Utah authorities had. O'Rourke informed Anderson that he was going to contact the Utah authorities. He told Anderson that he and Daw were only talking to Anderson because he told them that he wanted to talk about the other crimes, and reiterated that he did not have to talk to them at all. O'Rourke then terminated the interview and arranged for Anderson to be interviewed by Thompson.

[ER 03554]

Given this understanding of the facts, the district court concluded that "any failure to disclose the substance of the 7:04 a.m. interrogation to the defense did not violate *Brady* as the information contained therein was not favorable to the defense and thus was not material." [ER 03555] In other words, the information as evidence could not have been successfully used in state court to suppress Anderson's confessions to Sergeant Thompson.

Anderson at all times knowingly waived his right to an attorney. He agreed to talk to Daw and O'Rourke about the Lyman homicide, and he volunteered a desire to go beyond that interview with respect to other crimes about which San Bernardino

authorities had no knowledge. The record conclusively refutes the contention that Anderson retreated from his desire to talk in favor of invoking his right to remain silent. In fact, Anderson testified in the second penalty phase that he talked to the officers about the Glashien killing because he had a pre-existing agreement with his confederates to do so should he ever get arrested, which we shall discuss in greater detail in Part II of this opinion. San Bernardino authorities scrupulously respected his request to delay the conversation Anderson initiated, and when Sergeant Thompson appeared on the scene, he opened the conversation with fresh *Miranda* warnings and three simple preliminary questions to Anderson:

Q. Do you desire to consult with an attorney first or have one during the interview?

A. No.

Q. Okay. Having your rights in mind, do you desire to go ahead and talk to me?

A. Yes.

Q. Has anyone threatened you or promised you anything to make this statement?

A. No.

Simply put, this case is not similar to *Pettingill,* to *Fioritto,* or to any of the cases upon which *Pettingill* relies. In *Pettingill,* the subsequent interrogating officer "conceded that defendant had previously done nothing to indicate a desire to talk to him." 21 Cal.3d at 236, 145 Cal. Rptr. 861, 578 P.2d 108. Pettingill himself explained that he waived his right during the third interrogation only because he "just wanted to get them off my back." *Id.* We are unable to find any cases or principle in relevant California law that prohibit police from talking to a suspect when the suspect wishes to talk. *Pettingill* itself contemplates a different rule for cases where "it is the suspect who initiates the renewed conversation with the police...." *Id.* at 241 n. 4, 145 Cal.Rptr. 861, 578 P.2d 108. In those circumstances,

the test is only whether any ensuing confession was "involuntary in the traditional sense," i.e., "the product of improper threats or promises of leniency made by the police during the first interrogation." *Id.* (citation omitted). It was Anderson who initiated and caused the visit of Salt Lake authorities to talk to him, and Sergeant Thompson quite appropriately opened the conversation by clarifying and confirming that Anderson still wanted to talk. Anderson himself has offered no contradictory evidence on this issue, either by way of testimony, declaration, or affidavit.

This investigation was remarkably free of any pressure or tactics designed to induce Anderson to talk. No promises of leniency or threats were used to get Anderson to open up. His waivers were manifestly knowing and intelligent, and his confessions were plainly voluntary. Moreover, we can discern no improper motive on behalf of any authority in withholding the tape. The San Bernardino authorities' view that it contained no useful information to either side was eminently reasonable even though they now recognize that the better practice would have been to include it in the discovery.

## II

### *Arraignment*

Anderson was arrested at 3:47 a.m. on Monday, May 26, 1980. He was not arraigned until Thursday, May 29, 1980, some seventy-six hours after he was taken into custody. Relying on *County of Riverside v. McLaughlin,* 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), decided eleven years after his arrest, Anderson argues that the State violated his Fourth Amendment rights by detaining him for more than 48 hours prior to arraignment. Anderson maintains that because the State procured his confession to the Blundell and Glashien homicides ("May 28th confessions") as well as the incriminating interview with Dr. Flanagan ("Flanagan Interview") more than 48 hours after arrest, the May 28th confessions and the Flanagan

Interview were obtained in violation of the Fourth Amendment and, therefore, should be suppressed as "fruit of the poisonous tree."

1. Is this Fourth Amendment claim Cognizable as Part of a Petition for Writ of Habeas Corpus?

■ Ordinarily, *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), would require that we not hear this claim in a federal habeas corpus proceeding because it arises from the Fourth Amendment. To quote the Supreme Court,

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

*Id.* at 482, 96 S.Ct. 3037. Here, however, and primarily because this particular Fourth Amendment claim did not even exist until years after Anderson's arrest and trials, we conclude that he did not benefit from the "opportunity for full and fair litigation" of it in California's courts to which he was entitled. *See United States ex rel. Bostick v. Peters,* 3 F.3d 1023, 1027–29 (7th Cir.1993) (review of Fourth Amendment claim not barred because petitioner did not have an opportunity to establish standing because of an unforeseeable procedural rule preventing the state court from reaching the merits of the claim). The California Supreme Court denied the claim because it could have been, but was not, raised on appeal. We held in *Park v. California,* 202 F.3d 1146, 1152–53 (9th Cir.2000), of course, that such a denial in 1996 did routinely entail a review by the Supreme Court of California of possible federal claims, but we are persuaded on these facts and circumstances that this kind of review falls short of the quality of litigation opportunity described in *Stone.* Thus, we proceed to the claim itself.

2. Can Anderson Raise *McLaughlin*'s 48–Hour Rule as an Issue?

In *Gerstein v. Pugh*, 420 U.S. 103, 125, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the Supreme Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to extended detention following a warrantless arrest. Subsequently, in *McLaughlin*, the Court clarified its holding in *Gerstein* by defining "prompt." Specifically, the Court held that "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *McLaughlin*, 500 U.S. at 56, 111 S.Ct. 1661. The *McLaughlin* Court emphasized that this 48–Hour Rule is not absolute. As the Court explained:

> This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake.

*Id.* If the probable cause determination does not occur within 48 hours, however, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id.* at 57, 111 S.Ct. 1661. The Court cautioned that neither intervening weekends,[1] nor the time required to consolidate pretrial proceedings qualifies as an "extraordinary circumstance." *Id.*

■■■ Three years later, the Court decided *Powell v. Nevada*, 511 U.S. 79, 114

S.Ct. 1280, 128 L.Ed.2d 1 (1994), in which it held that *McLaughlin* applied retroactively to all cases pending on direct review or not yet final[2] when *McLaughlin* was decided. *Powell*, 511 U.S. at 84–85, 114 S.Ct. 1280; *see also Griffith*, 479 U.S. at 328, 107 S.Ct. 708 ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct reviews or not yet final."). However, *Powell* specifically left open the question whether suppression is the appropriate remedy for a *McLaughlin* Fourth Amendment violation, *see Powell*, 511 U.S. at 85, 114 S.Ct. 1280, and the Supreme Court has not yet resolved this issue.

■■■ Here, Anderson contends that he is entitled to raise a *McLaughlin* claim even though he did not raise a delayed arraignment claim of any kind in state court. He stakes his entitlement to such a delayed claim on the ground that his conviction was not final at the time *McLaughlin* was announced. Anderson is correct. The Supreme Court rendered its decision in *McLaughlin* on May 13, 1991, but Anderson's petition for certiorari in the United States Supreme Court was not denied until October 7, 1991, almost five months later. Thus, Anderson's conviction was not final, *see Griffith*, 479 U.S. at 321 n. 6, 107 S.Ct. 708, and *McLaughlin*'s 48 Hour–Rule applies. *See Powell*, 511 U.S. at 84–85, 114 S.Ct. 1280.

The State asserts that *McLaughlin* cannot apply to this case because, unlike the appellant in *Powell*, Anderson did not raise a federal delayed arraignment claim until 1994, when he filed his initial habeas corpus petition. We disagree. Relying on *Griffith*, the *Powell* Court held that the 48–Hour Rule would apply to *all* cases that were pending on direct review or not yet

---

1. The Ninth Circuit has interpreted this language in *McLaughlin* as meaning intervening weekends *or* holidays. *See Hallstrom v. City of Garden City*, 991 F.2d 1473, 1480 (9th Cir.1993).

2. A case is "final" if "a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." *Griffith v. Kentucky*, 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

final when *McLaughlin* was decided. *Id.* at 84–85, 114 S.Ct. 1280. Clearly, the Court did not limit its holding to cases in which the appellant raised the delayed arraignment issue below. Accordingly, we conclude that the law allows Anderson to raise a delayed *McLaughlin* claim.[3] The arguments made by the State do not dictate otherwise, although as we shall see, they do have an impact on the choice of a remedy in this case.

### 3. Did the State Violate Anderson's Fourth Amendment Rights?

 As discussed above, *McLaughlin* held that if the probable cause determination does not occur within 48 hours, the government has the burden of demonstrating the existence of a bona fide emergency or other extraordinary circumstance. *McLaughlin*, 500 U.S. at 57, 111 S.Ct. 1661. In this case, Anderson was arrested on May 26 at 3:47 a.m., but was not arraigned until the morning of May 29, approximately 76 hours later. As such, the State must furnish a valid excuse for this delay. *Id.* The State has not borne that burden.

 The *McLaughlin* Court made clear that intervening weekends or holidays would not qualify as an extraordinary circumstance, so the State cannot argue that the delay was reasonable on the ground that May 26 was Memorial Day. Instead, the State maintains that:

> even if the delay was for the purpose of obtaining the Thompson confession and Flanagan evaluation, such were not impermissible reasons, and they did not render the delay "unreasonable".... The confession Appellant made to Detective Jerry Thompson pertained solely to the Utah killings. Those killings, in turn, assisted the prosecution in making

the charging decision (i.e., capital case or not).

Under *McLaughlin*'s 48–Hour Rule, however, the delay was presumptively "unreasonable." Furthermore, the State's explanation that arraignment was delayed because law enforcement was collecting evidence about the Utah killings in order to aid in the decision whether to charge Anderson with a capital offense does not qualify as an "emergency or other extraordinary circumstance." In fact, courts have held in recent cases that it is improper to delay arraignment in order to investigate the suspect's participation in "additional crimes" (i.e., crimes that were not the basis for arrest). *See United States v. Davis*, 174 F.3d 941, 945 (8th Cir.1999); *Willis v. City of Chicago*, 999 F.2d 284, 289 (7th Cir.1993). *But see United States v. Sholola*, 124 F.3d 803, 823 (7th Cir.1997) (Wood, J., concurring) ("I therefore regard the majority's statement ... that the police may always hold an individual 'while investigating other crimes that he may have committed, so long as they have sufficient evidence to justify holding the individual in custody in the first place,' as inconsistent with the holding of *Willis*."). Moreover, as Anderson points out, California law does not require that special circumstances be charged at arraignment, and, in this case, the prosecution did not charge Anderson with a capital offense until two months *after* arraignment. Thus, because the State did not rebut the presumption that the 76 hour delay was unreasonable, we conclude that the State violated Anderson's Fourth Amendment rights under *McLaughlin*.

### 4. What is the Appropriate Remedy for a *McLaughlin* Violation?

 The next issue we must resolve is what the appropriate remedy is for a fail-

---

**3.** In addition, *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), does not bar the application of the 48–Hour Rule on collateral review because *McLaughlin* was decided before Anderson's conviction became final. *See Bell v. Hill*, 190 F.3d 1089, 1091 (9th Cir.1999); *see also O'Dell v. Netherland*,

521 U.S. 151, 157, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997) ("Petitioner's conviction became final on October 3, 1988, when we declined to review the Virginia Supreme Court's decision affirming his sentence on direct review.").

ure promptly to arraign an arrestee in connection with statements made by him past the time that the delay was reasonable. As indicated, the Supreme Court has not spoken on this subject, leaving it unresolved in *Powell v. Nevada.* As an initial matter, however, it is well settled that a *McLaughlin* violation arises from the Fourth Amendment. See *McLaughlin,* 500 U.S. at 47, 111 S.Ct. 1661; *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Although suppression of evidence has been a preferred remedy for a Fourth Amendment violation, see *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), it is not the automatic remedy for any such violation. *See Arizona v. Evans,* 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) ("The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.") (quoting *Illinois v. Gates,* 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

■ The answer lies in the very purpose of the exclusionary rule; it is based in large part on the need, and the ability, to guide police conduct. *See United States v. Leon,* 468 U.S. 897, 916, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (exclusionary rule not applicable because police error not intentional). The Supreme Court demonstrated the application of this aspect of the exclusionary rule in *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). In *Harris,* the defendant made a statement after an warrantless in-home arrest. Warrantless in-home arrests are of course illegal under *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), although Harris's arrest was supported by probable cause. The Court held that, because the statement was not made in the home and because police had probable cause to arrest, the statement was not subject to suppression.

Four years later in *Powell,* the Supreme Court framed the holding in *Harris:* "In *Harris,* we held that violation of the Fourth Amendment's rule against warrantless arrests in a dwelling ... generally does not lead to the suppression of a post-arrest conviction." 511 U.S. at 85 n. *, 114 S.Ct. 1280 (citation omitted). But the Court went on to distinguish the *McLaughlin* situation from *Harris,* noting that *McLaughlin* "targets a different constitutional violation-failure to obtain authorization from a magistrate for a significant period of pretrial detention."

■ Based on the above analysis, we conclude that the appropriate remedy for a *McLaughlin* violation is the exclusion of the evidence in question—*if* it was "fruit of the poisonous tree." This approach ensures that courts will not suppress evidence causally unrelated to the Fourth Amendment violation. At the same time, this test protects the arraignment right in question by barring any exploitation of the delay that causally produces a statement. Our conclusion rests upon *Brown v. Illinois,* which explained the interplay between the Fourth and Fifth Amendments in the suppression context:

Although, almost 90 years ago, the Court observed that the Fifth Amendment is in intimate relation with the Fourth, the *Miranda* warnings thus far have not been regarded as a means either of remedying or deterring violations of Fourth Amendment rights. Frequently, as here, rights under the two Amendments may appear to coalesce since the unreasonable searches and seizures condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment. The exclusionary rule, however, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. It is directed at all unlawful searches and seizures,

and not merely those that happen to produce incriminating material or testimony as fruits. In short, exclusion of a confession made without *Miranda* warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. *Miranda* warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation. Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* [*v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)] requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be *sufficiently an act of free will* to purge the primary taint. *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment.

*Brown,* 422 U.S. at 601–02, 95 S.Ct. 2254 (internal citations and quotation marks omitted) (emphasis added).

■ Under the "fruit of the poisonous tree" test, the question is whether the confession was obtained by exploitation of the Fourth Amendment violation, or "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun,* 371 U.S. at 488, 83 S.Ct. 407. A confession obtained during an unreasonable detention is subject to suppression *unless* it "was *sufficiently an act of free will* to purge the primary taint of the unlawful invasion." *Id.* at 486, 83 S.Ct. 407 (emphasis added); *see Powell v. State,* 113 Nev. 41, 930 P.2d 1123, 1126 (Nev.1997) ("The government has the burden of showing a 'sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.' ") (quoting *Oregon v. Elstad,* 470 U.S. 298, 306, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

In *Brown,* the Supreme Court set forth the following factors for courts to consider in answering this question: (1) the presence or absence of *Miranda* warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254. In delineating the "fruit of the poisonous tree" analysis, the *Brown* Court stated also that the "voluntariness of the statement is a threshold requirement," and that the government has the burden of proving the admissibility of the challenged confession. *Id.* at 604, 95 S.Ct. 2254.

■ To summarize, courts utilizing the "fruit of the poisonous tree" test with respect to a subsequent statement must determine (1) whether the statement was voluntary, not simply whether it occurred during the detention, and (2) whether it was either (a) the causal product of the violation, or (b) sufficiently an act of free will to delink it from the primary taint.

### 5. Were Anderson's Confessions to Thompson Fruit of his Extended Detention?

■ On this record, we conclude in *Brown* terms that the Utah confessions were not only voluntary, but also that they were uniquely the product of Anderson's untainted free will, not the harvest of his extended incarceration before arraignment, and not the fruit of flagrant or inappropriately purposeful exploitation of any illegality. Drawing on our discussion in Part I of this opinion about the context of these confessions, we so conclude for the following reasons.

As a threshold matter before we get to the *Brown* factors, Anderson's confessions were clearly voluntary. No one avulsed this information from him. In fact, when his attorney, Ames, was asked during the habeas evidentiary hearing about his client's confessions to the Utah killings, Ames testified that Anderson had confirmed that his confessions to Thompson

were not only free and voluntary, but volunteered:

Q. (By Mr. Gonzalez to Ames) Did you ask [Anderson] if any of the confessions or information he gave to the detectives was done in an involuntary manner?

A. (By Mr. Ames) Yes.

Q. And what did he say?

A. He said no, he volunteered the information.

Q. Did you ask him if he was ever coerced in any manner by any of these police officers involved in this case?

A. He said he was not.

As to the four *Brown* factors, our analysis is as follows:

First, a fresh set of Miranda warnings was given to Anderson immediately before the Utah confessions. He was then asked if he wanted to talk, and he answered, "Yes." Not only did Anderson clearly waive his rights, but he confirmed that he was talking of his own free will, and that he had a pre-existing independent reason for injecting this subject into the San Bernardino investigation. This satisfies the first of *Brown*'s four attenuation factors.

Second, it is clear that *Brown*'s "temporal proximity" factor weighs in Anderson's favor. The confessions occurred at a time when, as we learned almost a decade after Anderson's arrest, he should already have been arraigned.

Third, this case involves a distinctive set of facts and circumstances that sets it apart from the usual case in terms of whether a statement is causally linked to a violation. The distinction is this: Anderson *volunteered* a desire to tell the deputies about the Utah crimes. He did so soon after a lawful arrest, after advice of rights, and while his detention was plainly legal. The tree from which the fruit ultimately fell was a tree not only free of illegality or misconduct, but offered up by Anderson at a time prior to the arraignment violation. The chain of causation actually started before the violation of his right to be arraigned.

The San Bernardino deputies had no independent information about these crimes. Indeed, they were committed in a different jurisdiction. Anderson was not under arrest or under suspicion for these crimes when he said he wanted to discuss them. In fact, and according to Anderson's trial testimony in 1986, the Utah confessions were the direct product of a pre-existing agreement he had with the people who had made successful his escape from the Utah State Prison. The alleged agreement was to speak up and "take the rap" for the Glashien homicide if he ever got caught for some other crime. Here is how Anderson explained the agreement:

Q. (By Mr. Glazier to Anderson) And you told us [on direct examination] that the debt you owed—well, tell us about that debt you owed and why you admitted to killing Glashien.

A. When I escaped, walked away, however you want to look at it, from the Utah State Prison, they were looking for me, the law enforcement authorities were looking for me.

And these people hid me. And they went through a lot. They—in fact, one man's house, I guess you can call it, raided because they thought I was there.

And I stayed in the mountains in Mill Creek Canyon for several days. And they supplied me with what I needed and took care of me.

And then eventually got me out of town when the heat died down.

. . . . .

Q. Didn't you tell us that you were asked to take—you were asked to take the rap for the Glashien killing by people in Utah, and you said yes, that if you were arrested—

A. Yes. That's what happened.

Q. You testified to that?

A. Yes. Just yesterday or the day before.

Q. Now, as a burglar you know the difference between the punishment for burglary and murder, don't you?

A. Yes, I do.

Q. And yet because of that obligation, people had told you if you were arrested—and I assume that you're talking about the possibility of being arrested for burglary because you didn't anticipate killing anybody, did you?

A. No.

Q. So that if you were arrested for burglary, that as a good guy and to fulfill responsibility and the debt that you had, you were going to step up to the rap for a murder?

A. Yes.

Q. *And you told us that you were going to do that to fulfill that obligation just if you were arrested, regardless of what the charge was? Is that true?*

A. Yes.

. . . . .

Q. But it was your understanding that they had said, "We want you to take the rap for it?"

A. That was an agreement we had, yes.

Q. But you didn't ever go to law enforcement voluntarily and say, "I did it," until you were captured, did you?

A. No. I had no intention of doing that. No.

Q. You weren't going to be that generous, were you?

A. No.

Q. *You were going to wait until somebody caught you. And then at that point be the benefactor of those individuals up in Utah?*

A. Yes.

(emphases added).

Anderson contemporaneously alluded to this debt or obligation on May 28, 1980, at the close of his statement to Thompson:

Q. (Thompson) ... Have I or has anyone else threatened you in order to make this statement or promised you anything?

A. (Anderson) No.

Q. You done it on your own *free will?*

A. Yes.

Q. After having your rights in mind?

A. Yes. I'd just like to say that, uh, I did, I uh, made these statements *simply to, uh, clear up the fact that a lot of people were suspected of the crimes that shouldn't had been suspected.* And that I have been informed of it by various people that it should be cleared up because they didn't have anything to do with it. And that's my *main purpose* here with these crimes in Utah.

(emphases added).

After Thompson arrived on the scene and advised Anderson of his right to remain silent, and after Anderson said he did not want to consult an attorney or have one with him during the interview, Thompson asked Anderson, "Okay. Having your rights in mind do you desire to go ahead and talk to me?" Anderson's answer was, "Yes." This exchange indicates without any doubt that Anderson remained steadfast in his pre-detention decision to exonerate his friends if and when he got caught. Whether he was telling the truth about his part in Glashien's murder, of course, was for the jury to decide.

When Anderson said previously on May 26, 1980, that he wanted to wait to talk about the crimes in order to see what the Utah authorities had, he said, "Well, it's just better right now for me to wait"—not "I have changed my mind and decided not to talk." As indicated earlier, this conduct was not the equivalent of an assertion of the right to remain silent as to the Utah crimes. To the contrary, Anderson was clearly in control of his own decisions and exercising untrammeled free will. The delay, then, was occasioned by the time it took Thompson to arrive on the scene. This delay was attributable to Anderson's behavior and desires, not to any miscon-

duct on the part of any law enforcement officials. Anderson was the one who wanted to wait, *not* the deputies; and it was his request for delay that caused the confessions to occur during his extended detention. The district court made the factual findings that Anderson's statements during the 7:04 a.m. interview on May 26, 1980, "did not constitute an unequivocal assertion of the right to remain silent," and that Anderson informed O'Rourke and Daw that "he would be willing to discuss the [Utah] crimes when he found out what the Salt Lake City authorities had." [Er. 03554]. We believe these findings not only to be not clearly erroneous, but fully supported by the evidence developed during the evidentiary hearing.

■■ To conclude that a statement was volunteered is not just another way of saying that it was voluntary. Certainly all volunteered statements are normally voluntary, but not all voluntary statements are volunteered—far from it. The definition of "to volunteer" is "to give up or offer to give up on one's own initiative," "to enter into or offer to enter into a venture of one's own free will." *Webster's II New Riverside University Dictionary* (1984). This distinction is critical when the issue is whether an act is sufficiently a matter of free will to be purged of the primary taint, such as the inquiry is here.

Anderson's independent and continuing purpose, however one might regard it, was freely discharged and causally unconnected to the detention on the San Bernardino murder. To reiterate, it is here that we find the tree from which the confessions fell as fruit, not in the failure promptly to arraign. In *Brown* terms, his purpose in confessing to extraneous crimes—to become if a benefactor of his friends—was an intervening and continuing circumstance that manifestly outweighs and overrides the temporal proximity factor. The factor that caused him to talk about the Utah crimes was his capture, not the delayed arraignment. In terms of its particular facts and circumstances, this appears to be the situation the Supreme Court had in

mind when it said in *Brown*, "It is entirely possible ... that persons arrested illegally may decide to confess as an act of free will unaffected by the initial illegality." *Brown*, 422 U.S. at 603, 95 S.Ct. 2254.

Fourth, we are simply unable to identify any knowing and willful or flagrant constitutional misconduct to deter. *Id.* at 604, 95 S.Ct. 2254, ("The purpose and flagrancy of the official misconduct are all relevant.") There may have existed a "but for" relationship between the extended detention and the confessions, which is debatable given Anderson's overriding resolve to exonerate his friends as soon as he was caught, but no legally cognizable *causal* connection. According to Ames and his client, Anderson had previously decided to confess to the Utah murder if he was ever arrested. Anderson fulfilled his promise by volunteering to speak about the Utah killing *before* any improper detention. The officers did delay his arraignment, but they did not do so in purposeful violation of a specific rule on the books at that time. To impose the exclusionary rule on this set of facts would not serve the rule's purposes at all.

Anderson did not raise until almost fourteen years after his first trial any Fourth Amendment delayed arraignment claim. In fact, not until his appearance in federal court did he make it an issue. *See People v. Anderson*, 52 Cal.3d 453, 276 Cal.Rptr. 356, 801 P.2d 1107 (1990). All of this can easily be explained: He did not have a viable recognized federal claim of this kind until 1991 at the earliest. Ames testified at the evidentiary hearing in district court that he was well aware of California law that required a defendant to show prejudice over and above the delay in order to be entitled to relief. *See People v. Turner*, 8 Cal.4th 137, 175, 32 Cal.Rptr.2d 762, 878 P.2d 521 (1994); *People v. Harris*, 28 Cal.3d 935, 953, 171 Cal.Rptr. 679, 623 P.2d 240 (1981). Ames testified that he chose not to try to suppress the Utah confessions because he believed that he could show no prejudice from the delay.

The district court concluded that "Ames's decision not to seek to suppress Anderson's confession on delay in arraignment grounds was an informed strategic decision which the court will not second-guess." [Er. 03557].

Deterrence best serves its remedial purpose when it serves as a remedy for a constitutional wrong which officers either knew or should have known was against the law. To punish police (and society) twenty years after an event on the basis of rules not clearly defined and established at the time of the occurrence actually disserves the purpose of deterrence by rendering it irrational. *See Leon,* 468 U.S. at 908, 104 S.Ct. 3405, ("Indiscriminate application of the exclusionary rule ... may well generat[e] disrespect for the law and administration of justice."). Moreover, we are now in the year 2000. Law enforcement officers currently have many years of the *McLaughlin* rule under their collective belt, and we discount entirely that idea that the suppression of the confessions in this case will add to their education. This is especially so in a case where the source of the confession was solely the defendant's gratuitous offering. Accordingly, *Brown's* final factor weighs in favor of the State.

In summary, and in the words of *Wong Sun,* 371 U.S. at 488, 83 S.Ct. 407, this disputed evidence was obtained not by exploitation of any unconstitutional violation, but by means sufficiently attenuated from the illegality—Anderson's manifest exercise of free will—so as to be untouched by any taint. *See also United States v. Manuel,* 706 F.2d 908, 911 (9th Cir.1983) (the voluntary nature of statements made after a questionable arrest and the lack of flagrant police misconduct or pressure to confess serve to attenuate any taint of previous illegality).

 As to the interview by Dr. Flanagan, however, we come to a different intermediate conclusion, but not a different result. The Flanagan interview was not the product of Anderson's free will. Its dual purpose was to elicit information from him

that could be used against him at trial and to restrict his options by curtailing any mental defenses that he might have raised. The deputies took advantage of and exploited the delayed arraignment to generate this evidence, and we conclude that the causal link between the detention and the evidence required to invoke the exclusionary rule does exist.

Nevertheless, we conclude in the light of the entire record that the admission and use by the prosecutor of Dr. Flanagan's testimony did not inflict any substantial or injurious damage to Anderson's case because we are convinced that the doctor's testimony "did not contribute to the verdict obtained." *Neder v. United States,* 527 U.S. 1, 15–16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *United States v. Garibay,* 143 F.3d 534, 539 (9th Cir.1998). Dr. Flanagan simply characterized Anderson's behavior and described his personality. The prosecution's purpose in introducing this testimony was preemptively to remove any psychiatric or mental disease or defect defenses that the defense might offer. But here, the defense neither offered—nor for that matter intended to offer—such a defense. The reason for the defense's decision to eschew any such defenses stemmed from Anderson's adamant statements to Ames that he did not want to offer an insanity plea. Thus, Dr. Flanagan's testimony about Anderson's personality in no way interfered with the defense. Ames's explanation for his failure to object to Dr. Flanagan's opinions at the second trial was, "I felt they didn't hurt me at trial because my defense was not based on anything that he was giving an opinion on.... His opinions regarding diminished capacity, insanity, those sorts of things or what he was saying did not enter into any of the theories of the defense that I was going to present to the jury." [SER 2425, 2426].

Moreover, Dr. Flanagan's testimony was merely a shadow or a reflection of what was otherwise in the record, most of which came directly from Anderson himself in his

detailed and clear-headed confessions to three separate murders. Anderson told the detectives that he was either "born or trained to be a killer;" and that he "always wanted to be a killer." *Anderson,* 52 Cal.3d at 465, 276 Cal.Rptr. 356, 801 P.2d 1107. It did not take Dr. Flanagan's testimony that Anderson had an "anti-social personality" or that he was self-absorbed and impulsive to establish for the jury what they could already deduce. Dr. Flanagan opined also that Anderson did not suffer from "any mental disease or defect that would substantially impair his capacity to appreciate the nature of his conduct...." This, too, the jury could easily extract from his confessions and his behavior. Measured against the State's entire case and the nature of the defense, Dr. Flanagan's testimony was patently insignificant.

## III

### *Challenge to Comments on Procedural History of the Case*

Anderson's next claim is that, under *Caldwell v. Mississippi,* 472 U.S. 320, 339–40, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the trial judge violated his constitutional rights during the second trial by commenting on the procedural history of the case in a way that diminishes the jurors' responsibility for the sentencing decision. The State maintains, however, that because the California Supreme Court already denied this claim on procedural grounds, this court should not consider it. Although we ultimately conclude that Anderson's *Caldwell* claim fails, we believe that the claim is not procedurally defaulted, and that we must address the merits.

1. Procedural Default [4]

■ "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an *independent and adequate state procedural rule,* federal habeas review of the claims is barred unless the prisoner can demonstrate cause

for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (emphasis added). In this case, the California Supreme Court denied Anderson's *Caldwell* claim on the ground that Anderson's counsel failed to object to the trial judge's comments, thereby waiving this claim. *People v. Anderson,* 52 Cal.3d 453, 468, 276 Cal.Rptr. 356, 801 P.2d 1107 (1990). Thus, if this waiver rule invoked by the *Anderson* court is "an independent and adequate state procedural rule," then the *Caldwell* claim is procedurally defaulted.

■ In order for a state procedural rule to be "adequate," it "must have been 'firmly established and regularly followed' by the time as of which it is to be applied." *Ford v. Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (quoting *James v. Kentucky,* 466 U.S. 341, 348, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984)). This means that the question is whether the state courts were regularly and consistently applying the relevant procedural default rule "at the time the claim should have been raised." *Fields v. Calderon,* 125 F.3d 757, 760 (9th Cir.1997).

Here, the allegedly improper comments were made during Anderson's second trial, which took place in late 1985 and early 1986, only about six months after the Supreme Court rendered its decision in *Caldwell.* Not surprisingly, then, the "rule" that a defendant waives a *Caldwell* claim by failing to object when the comments are made was not "firmly established and regularly followed" at the time of Anderson's second trial. In fact, it appears that this rule still is not consistently applied. *See People v. Jackson,* 13 Cal.4th 1164, 1238, 56 Cal.Rptr.2d 49, 920 P.2d 1254 (1996) ("The fact that defendant did not make a contemporaneous objection to the prosecu-

---

4. In the proceedings below, the district court did not address the State's argument that this

claim is procedurally defaulted and, instead, simply denied it on the merits.

tion's remarks does not bar him from raising a claim of *Caldwell* error on appeal."); *People v. Clark*, 5 Cal.4th 950, 1035, 22 Cal.Rptr.2d 689, 857 P.2d 1099 (1993) ("We have never required an objection to raise claims of error based upon *Caldwell v. Mississippi.*") (internal citations and quotation marks omitted); *People v. Bittaker*, 48 Cal.3d 1046, 1103, 259 Cal.Rptr. 630, 774 P.2d 659 (1989) (same). *But see People v. Freeman*, 8 Cal.4th 450, 523, 34 Cal.Rptr.2d 558, 882 P.2d 249 (1994) (holding *Caldwell* claim waived because there was no objection); *People v. Poggi*, 45 Cal.3d 306, 340, 246 Cal.Rptr. 886, 753 P.2d 1082 (1988) (same). Accordingly, we conclude that the waiver rule is not an adequate state ground to bar federal review of Anderson's *Caldwell* claim.

### 2. *Caldwell* Claim

■ In *Caldwell*, the Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328–29, 105 S.Ct. 2633. More recently, the Court has said that it "read[s] *Caldwell* as 'relevant only to certain types of comment[s]—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" *Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (quoting *Darden v. Wainwright*, 477 U.S. 168, 184 n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). Thus, to establish a *Caldwell* violation, a defendant must show that the remarks to the jury "improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989); *see also Hendricks v. Vasquez*, 974 F.2d 1099, 1108 (9th Cir.1992).

■ Here, Anderson's *Caldwell* claim is based on the judge's comments during voir dire at the beginning of Anderson's second penalty phase trial (1) that Anderson's prior death sentence was re-

versed because of "technical questions in connection of [sic] the penalty," and (2) that the prior death sentence "went up automatically on appeal to the California Supreme Court, as all such cases do." According to Anderson, these comments "misled the jury to believe that Anderson's sentence would ultimately be decided by the same appeals court that had reversed the prior death sentence and with which the ultimate responsibility for sentencing lay." This argument is unpersuasive.

While it is true that the judge made the comments Anderson complains about, such comments are insufficient to establish a *Caldwell* claim, particularly when viewed within the context of the entire trial. *See Sawyer v. Butler*, 881 F.2d 1273, 1286 (5th Cir.1989). On the first day of jury selection in Anderson's retrial, the judge addressed the jury and said the following:

> There has been a previous trial of this matter and he has been convicted of first degree murder. But the matter has to be retried on the question of—on the *technical* questions in connection of [sic] the penalty.

ER at 1436 (emphasis added). However, the court then went on to explain in great detail why the California Supreme Court reversed Anderson's death sentence.

> In this particular case, in the first trial, the jury found the defendant guilty of first degree murder.... They found true the allegation of special circumstances, and that allegation was that the killing was committed in the course of a first degree burglary. It's what they called a felony murder rule, where if you kill somebody in the course of certain crimes, including first degree burglary, it's automatically first degree murder. And that was also a special circumstance which brought into play the death penalty.
>
> The jury then tried the penalty phase and they returned a verdict of death and the defendant was sentenced to death. However, about that time some of the rules applying to felony murder were changed. And so the Supreme Court

sent it back for directions for us to retry the special circumstance issue and the penalty phase issue in light of the new rules. The new rules require that before a special circumstance of felony murder can be found true, the district attorney must prove and the jury must specifically find that the killing was done intentionally.

You see, under the old felony murder rule, even an accidental killing would bring into play the felony murder rule and the death penalty. But the Supreme Court said that no, in order for the death penalty to come into play—in other words, the special circumstance to be found to be true—the jury must have proof before them and they must be satisfied beyond a reasonable doubt that the killing was intentional.

ER at 1442–43. In light of this careful and deliberate explanation of the state supreme court's legal reasoning, we conclude that the judge's one-time use of the word "technical" in no way misled the jury, much less "in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Romano*, 512 U.S. at 9, 114 S.Ct. 2004 (internal quotation marks omitted).

Anderson argues also that the trial judge violated his Eighth Amendment rights when he told the jurors:

So they had a penalty trial, penalty phase of trial. And the jury returned a verdict indicating that the defendant should suffer the death penalty. That *went up automatically on appeal* to the California Supreme Court, as all such cases do.

ER at 1474 (emphasis added). In making this argument, Anderson relies heavily on Justice O'Connor's concurring opinion in *Caldwell*, where she said that "[l]aypersons cannot be expected to appreciate without explanation the limited nature of appellate review, especially in light of the reassuring picture of 'automatic' review evoked by the sentencing court and prosecutor in this case." *Caldwell*, 472 U.S. at 343, 105 S.Ct. 2633. Furthermore, Justice

O'Connor warned that "[j]urors may harbor misconceptions about the power of state appellate courts or, for that matter, this Court to override a jury's sentence of death." *Id.* at 342, 105 S.Ct. 2633.

The relevant facts of *Caldwell*, however, differ markedly from the facts of this case. In *Caldwell*, the prosecutor argued the following during his closing:

Ladies and gentlemen ... I'm in complete disagreement with the approach the defense has taken. I don't think it's fair.... I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it.... For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.

*Id.* at 325–26, 105 S.Ct. 2633.

Unlike in *Caldwell*, here, the judge's comments about automatic appeal did not lead the jury "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 329, 105 S.Ct. 2633. Quite to the contrary, the judge made it clear that the jurors must decide whether the special circumstance is true and, if so, whether Anderson deserved life imprisonment or death. For example, with regard to the special circumstance, the judge said:

So we're going to have a trial on the limited issue of whether or not at the time the defendant killed the elderly woman, shot and killed her, whether he intended to kill her. And there are a lot o[f] explanations, potential theoretical explanations other than intent to kill. For instance, accidental. Or maybe he was just shooting to scare her or something of this sort with no intent to kill her at all.

So the jury will hear all the evidence, what happened exactly in detail, and will

have to make up their mind whether they are all twelve satisfied beyond a reasonable doubt that at the time of this shooting he intended to kill her.

ER at 1475; 2RT at 950.

Similarly, the court explicated that it was the jury's responsibility to determine the appropriate penalty for Anderson.

[I]f the jury finds he did intend to kill the woman he shot, then that makes him eligible for the two most severe penalties we have. Either he can be imprisoned in State Prison for the rest of his natural life with no possibility of parole ever. Just he'll die in prison. Or he can be put to death in the gas chamber. Those are the only two choices we have once we get to that point.

The law requires, rather unusually, that a jury select the penalty. Ordinarily the jury is told not to even consider penalty.... So the jury, then, will be expected to make a decision between those two penalties based upon the evidence you've heard in both phases of the trial; that is, the circumstances of the killing and the background information about the Defendant himself.

2RT at 950–52. Thus, considering the judge's comment about automatic appeal in the context of the entire trial, it is clear that the remark did not "improperly describe[ ] the role assigned to the jury...." *Dugger*, 489 U.S. at 407, 109 S.Ct. 1211.

■ Finally, we conclude that Anderson suffered no prejudice from the trial judge's remarks because he himself intended to tell the jury of his death row incarceration and experiences as part of what is known in California as a "Death Row redemption" defense. This defense presents the defendant to the jury as a different person, a person rehabilitated by death row and thus no longer a candidate for death. As the California Supreme

Court observed in deciphering Ames's failure to object to the trial judge's remarks,

[I]t seems apparent that defense counsel herein had a tactical purpose for declining to object to the court's disclosures regarding defendant's death sentence and subsequent reversal on automatic appeal. During the course of trial and in argument, counsel frequently referred to the prior death sentence and ... presented a 'Death Row redemption' defense stressing defendant's changed attitude, reformed character and his many useful, redeemable skills. For example, counsel asked defendant whether his 'thinking' had changed during the five years since he was sentenced to death. Defendant replied that 'the experience of being condemned to die made me grow up and realize that it was a serious matter. And I matured. And I realized there's more to life than living and the life that I had lived. And maybe I had a chance to change.'

Regarding the reference to the automatic appeal, it is true that '[a]s a general rule, the jury should not be advised regarding the availability of an appeal in death cases, because such information may dilute the jury's sense of responsibility in fixing the penalty.' But any reasonable juror, knowing that defendant was once sentenced to death and was now being retried for the same crimes, could easily infer that an appeal was available to him.

We conclude that any error in the court's pretrial disclosures was waived by counsel's apparently tactical failure to object. We further conclude that it is not reasonably possible defendant was prejudiced by those disclosures.

*People v. Anderson*, 52 Cal.3d 453 at 468, 276 Cal.Rptr. 356, 801 P.2d 1107 (1990) (citations omitted). Accordingly, we reject Anderson's *Caldwell* claim.[5]

5. Although it is not clear from his brief, apparently Anderson also is arguing that, under *Romano*, the judge's comments violated the due process clause of the Fourteenth Amendment. To state such a claim, Anderson must show that "admission of evidence regarding

[his] prior death sentence so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." *Romano*, 512 U.S.

## IV

### *Lack of Jury Instruction on Lesser–Included Offenses*

■ Anderson's third claim on appeal is that the district court erred in concluding that the state trial court correctly instructed the jury. Specifically, Anderson argues that because he asserted a diminished capacity defense during the guilty phase of his first trial in 1981, the state court was also required to instruct the jury on lesser-included offenses to felony murder, and its failure to do so violated the Eighth Amendment as construed in *Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). This argument is unpersuasive.

■ Federal review of an allegedly erroneous jury instruction challenged collaterally is extremely limited. Under *Brecht v. Abrahamson,* 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the standard for determining whether habeas relief should be granted in a 28 U.S.C. § 2254 petition is whether the alleged (non-structural) trial errors "had substantial and injurious effect or influence in determining the jury's verdict." *See Bains v. Cambra,* 204 F.3d 964, 977 (9th Cir.2000) (*Brecht* standard should apply uniformly in all federal habeas corpus cases under 28 U.S.C. § 2254). Trial errors that do not meet this test are deemed harmless. *Eslaminia v. White,* 136 F.3d 1234, 1237 (9th Cir.1998). This deferential standard is controlling here.

Anderson claims that, under *Beck,* the state trial court was required to give a jury instruction on lesser-included offenses of felony murder in the guilt phase of his first trial. In *Beck,* the Supreme Court held that, in a capital case, due process requires the court to give a lesser included offense instruction if the evidence would support a conviction on that offense. 447 U.S. at 638, 100 S.Ct. 2382; *see also Hopper v. Evans,* 456 U.S. 605, 610, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). The challenged Alabama law at issue in *Beck* prohibited giving lesser included offense instructions in capital cases. 447 U.S. at 628–29, 100 S.Ct. 2382. Essentially, the Alabama law was an all-or-nothing rule that provided juries in capital cases with only two options: (1) find the defendant guilty of capital murder and automatically sentence the defendant to death, or (2) acquit the defendant. *Id.* at 642–43, 100 S.Ct. 2382. This rule, the Supreme Court held, provided for possibly unreliable results and was therefore constitutionally infirm. *Id.* at 637–38, 100 S.Ct. 2382.

At Anderson's first trial, there was evidence from his confessions and testimony by investigating officers that Anderson had consumed two half-pints of vodka the evening of the burglary. *See* ER at 1176–89. As such, because the state trial court found that there was "evidence of possible diminished capacity," *see* ER at 1282, it gave a diminished capacity instruction to the jury. *Id.* Anderson argues that because the court gave this instruction, it was also required to instruct on lesser-included offenses to felony murder. Otherwise, Anderson argues, the jury would be required to find Anderson guilty of both burglary and murder or, if the jury agreed that his capacity was diminished, to acquit him of both burglary and murder. Anderson asserts that this choice, without a third option to acquit of burglary, but convict on a charge of second-degree murder or manslaughter, violates *Beck.* Anderson's case, however, is distinguishable from *Beck* for three reasons.

First, *Beck* only applies to cases where the evidence would support a conviction on the lesser-included offense. 447 U.S. at 638, 100 S.Ct. 2382; *see also Clabourne v. Lewis,* 64 F.3d 1373, 1380 (9th Cir.1995) (noting that it is plain error for the court to fail to give a lesser included instruction on second-degree murder in a capital case "where the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater") (internal quotations omitted). at 12, 114 S.Ct. 2004. Anderson has failed to meet this standard.

Here, although Ames did not specifically request a lesser-included offense instruction, he did ask the court to tell the jury that the "defendant may be found guilty or not guilty of either or both of the offenses charged"—i.e., burglary and first-degree murder. 1RT at 2627. This instruction was akin to a lesser-included offense instruction in that it would have allowed the jury to find Anderson innocent of burglary, but guilty of murder, which would have made Anderson ineligible for the death penalty.

The trial court refused to give the instruction requested by Ames, explaining that it was not warranted because "I know of no factual situation in this case where [the jury] could find that the defendant is innocent of burglary but guilty of murder." Given Anderson's confessions to the Lyman murder, which included several statements indicating that he knew exactly what he was doing on the night in question, and having independently reviewed the trial record, we cannot disagree with the trial court's conclusion on this point. As such, the State has a persuasive argument that *Beck* does not apply to Anderson's case.

Second, unlike *Beck*, at the time of Anderson's trial, there was no California statute or law of any kind that prohibited instructions on lesser included offenses in capital cases, but not in non-capital ones. To quote from *Hopkins v. Reeves*, 524 U.S. 88, 96, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998), a recent Supreme Court case, California has not "erected an artificial barrier that restrict[s] its juries to a choice between conviction for a capital offense and acquittal." *Id.* at 96, 118 S.Ct. 1895.

Third, in contrast to *Beck*, if the jury convicted Anderson of burglary and felony murder, a death sentence would not automatically ensue. In the Alabama law at issue in *Beck*, the judge had ultimate authority on sentencing, yet the jury was not told this. 447 U.S. at 639 n. 15, 100 S.Ct. 2382. Instead, the jury was instructed that it must impose the death sentence if it found the defendant guilty and was thus

led to believe, by implication, that its sentence would be final. *Id.* Here, despite its decision to convict Anderson of burglary and felony murder, the jury could have also decided, based on the evidence in the penalty phase, not to sentence Anderson to death. Thus, the extreme choice between a complete acquittal or a sentence of death condemned by the Supreme Court in *Beck* was not present in Anderson's case. *See Hopkins*, 524 U.S. at 98–99, 118 S.Ct. 1895.

Moreover, in *Hopkins*, the Court held that the *Beck* rule applies only to those offenses that have been deemed by the state to constitute lesser-included offenses of the charged crime. *Id.* at 90–91, 118 S.Ct. 1895. The Court explained that the crucial distinction between *Beck* and *Hopkins* "is the distinction between a State's prohibiting instructions on offenses that state law recognizes as lesser included, and a State's refusing to instruct on offenses that state law does not recognize as lesser included." *Id.* at 99 n. 7, 118 S.Ct. 1895. The former is unconstitutional, while the latter is not. *Id.*

In *Hopkins*, the Court held that Nebraska was not constitutionally required to give an instruction on the non-capital charge of second-degree murder when the defendant was charged with the capital count of felony murder because, under Nebraska law, second-degree murder was not a lesser included offense of felony-murder. *Id.* at 96–97, 118 S.Ct. 1895. Specifically, the Court noted that under Nebraska law, second-degree murder was not a lesser included offense of felony murder because second-degree murder requires an intent to cause death, whereas felony murder does not. *Id.* at 95–96, 118 S.Ct. 1895. As a result, the Supreme Court upheld a conviction for felony murder (and the subsequent death penalty that was imposed by a separate three-judge panel) even though the jury at the guilt phase was given no option to find the defendant guilty of a non-capital crime. *Id.*

Hopkins is relevant here. At the time of Anderson's first trial, similar to the

Nebraska law at issue in *Hopkins*, California law did not require the prosecution to prove that Anderson intended to kill Mrs. Lyman as an element of felony murder. *See Anderson*, 38 Cal.3d at 61, 210 Cal. Rptr. 777, 694 P.2d 1149; *see also People v. Avalos*, 98 Cal.App.3d 701, 718, 159 Cal. Rptr. 736 (1979). The law only required proof of the specific intent to commit the underlying felony. *Id.*

Moreover, while there do not appear to be any California cases in existence at the time of Anderson's trial explicitly stating that there were no lesser-included offenses to felony murder, in deciding not to give such an instruction, the trial court relied on *Avalos*, *see* 1RT at 2629, which held that where the prosecution relies solely on felony murder, California law does not require an instruction on lesser-included homicide offenses, despite the defendant's assertion of a diminished capacity defense. *Id.* at 718–19, 159 Cal.Rptr. 736. Under *Hopkins*, therefore, because the trial court relied on California case law, which did not require any further jury instruction, the court's decision not to instruct on second-degree murder or manslaughter did not violate the Eighth Amendment as construed in *Beck*.

Anderson cites *People v. Ford*, 65 Cal.2d 41, 58 n. 9, 52 Cal.Rptr. 228, 416 P.2d 132 (1966), and *People v. Mosher*, 1 Cal.3d 379, 390, 82 Cal.Rptr. 379, 461 P.2d 659 (1969), to support his argument that the court was required to instruct on lesser-included offenses. However, in addition to other distinguishable facts, in contrast to Anderson's case, the prosecution in *Ford* and *Mosher* did not rely exclusively on felony murder to secure a conviction. *Id.* at 389–91, 82 Cal.Rptr. 379, 461 P.2d 659; *Ford*, 65 Cal.2d at 56, 52 Cal.Rptr. 228, 416 P.2d 132.

█ In addition, even assuming the state trial court erred in relying on *Avalos* instead of *Mosher* and *Ford*, this court may not reverse a conviction on collateral review unless the error caused a simultaneous violation of federal law. *See Estelle v. McGuire*, 502 U.S. 62, 71–72, 112 S.Ct.

475, 116 L.Ed.2d 385 (1991) ("[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."). Here, under *Hopkins*, the state court's reliance on *Avalos* did not violate the Eighth Amendment under *Beck* or any other constitutional provision and, thus, Anderson's conviction cannot be reversed on a federal petition for a writ of habeas corpus. *Id.; see also Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir.1990).

█ Finally, assuming arguendo that the state trial court erred in not instructing on a lesser-included offense such as manslaughter, Anderson's conviction must stand because the error did not have "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710. While there was some evidence of diminished capacity, it was slight. In contrast, there was an overwhelming amount of evidence illustrating that Anderson was fully aware of his actions on the night in question. For example, Anderson admitted at the re-enactment of the Lyman murder that he knew what he was doing, *see* SER at 2184–90, and during the penalty phase re-trial, he agreed that the first verdict was "righteous." SER at 1355. A sample of Anderson's blood taken on the morning of his arrest tested negative for alcohol, which confirmed Anderson's own statements that he was not severely intoxicated. SER at 167. Finally, the manner in which Anderson admitted to breaking into Mrs. Lyman's residence required a degree of mental acuity and dexterity uncharacteristic of a highly intoxicated person. Given the scarcity of evidence in the record to support the diminished capacity instruction, it is extremely unlikely the jury would have concluded that Anderson did not have the specific intent to commit burglary.

The "substantial and injurious effect" standard under *Brecht* reflects "the presumption of finality and legality that attaches to a conviction at the conclusion of direct review … It protects the State's

sovereign interest in punishing offenders and its good-faith attempts to honor constitutional rights, while ensuring that the extraordinary remedy of habeas corpus is available to those whom society has grievously wronged." *Calderon v. Coleman,* 525 U.S. 141, 145–46, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998) (internal quotations and citations omitted). With minimal evidence of diminished capacity in the record, it cannot be said that Anderson was "grievously wronged" by the trial court's failure to instruct the jury on lesser-included homicide offenses during Anderson's first trial.

## V

### *Assistance of Counsel*

Anderson's claim that he was the victim of ineffective assistance of counsel in violation of his Sixth Amendment rights breaks down into three parts. First, he contends that Ames provided deficient assistance by failing personally to meet with him except in court during his first trial. Second, Anderson asserts that Ames inappropriately conceded guilt in his closing argument when he asked the jury to convict his client of straight first degree murder, but not felony murder. Third, Anderson attacks Ames's defense against the death penalty during the second penalty phase trial, claiming *inter alia* that Ames's investigation and presentation of potentially favorable evidence were both seriously flawed.

1. Standard of Review

 Findings of fact relevant to a denial of habeas corpus are reviewed for clear error. *Bonin v. Calderon,* 59 F.3d 815, 823 (9th Cir.1995). A claim of ineffective assistance of counsel is a mixed question of law and fact reviewed *de novo. See United States v. Alvarez–Tautimez,* 160 F.3d 573, 575 (9th Cir.1998).

2. The *Strickland v. Washington* Framework

 *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

(1984), is the starting point for all ineffective assistance analysis. *Strickland* sets forth a two-part test that any petitioner must meet to succeed on an ineffective assistance claim. First, Anderson must show that his attorneys rendered deficient performance. *Id.* at 687, 104 S.Ct. 2052. Second, Anderson must show that such deficient performance resulted in prejudice. *Id.* This two-part test is the "benchmark" for any ineffective assistance claim: "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052. Failure to show either deficient performance or prejudice is sufficient to defeat Anderson's claim of ineffective assistance. *Id.* at 697, 104 S.Ct. 2052. Thus, the court need not discuss both components of the test if Anderson fails on either.

To show deficient performance, Anderson must demonstrate that, considering all of the circumstances, his attorneys' performance "fell below an objective standard of reasonableness" measured by prevailing professional norms. *Id.* at 688, 104 S.Ct. 2052. In other words, Anderson must prove that his attorneys made errors so serious that they were "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. 2052.

 The prejudice component of the test "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* More precisely, to show prejudice Anderson must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. This "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Put in the context of Anderson's challenge to his death sentence, this court must decide whether, considering the totality of the

evidence, "there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. 2052.

The *Strickland* Court provided significant guidance on the proper manner of conducting the two-part analysis required by an ineffective assistance claim. The court noted that the deficiency analysis required a reviewing court to be "highly deferential" to counsel's efforts on behalf of the petitioner, and strongly warned against the attraction of any attempt to "second-guess" the assistance provided. *Id.* at 689, 104 S.Ct. 2052. The Court noted that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Thus, we must indulge a "strong presumption" that counsel's efforts fell within the "wide range of reasonable professional assistance," and Anderson must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* Ultimately, the *Strickland* Court indicated that the Sixth Amendment's right to counsel was concerned with the "fundamental fairness" of the proceeding being challenged, i.e. whether the result of the proceeding was "unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696, 104 S.Ct. 2052.

Finally, because the issues of "strategic choices" and counsel's duty to investigate will likely play a significant role in this court's analysis of Anderson's ineffective assistance claim, we find it useful to invoke in full an enlightening passage from *Strickland*:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.... For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id.* at 690–91, 104 S.Ct. 2052.

3. Failure of Attorney–Client Relationship

Anderson contends that Ames's failure to meet with him except in court during the first trial led to inadequate consultation that infected the entire attorney-client relationship and prevented informed decision-making concerning pleas, defenses, strategies, and penalty phase presentations. The district court found that Ames "did not personally meet with Anderson in jail before the guilt phase trial." ER at 3519. The court also found, however, that Ames had communicated da-

ily with Anderson at trial and had discussed Anderson's case with his investigator and mental health experts, all of whom interviewed Anderson at Ames's direction. *Id.* The court found no evidence that Ames's failure to personally meet with Anderson before his capital trial, by itself, affected the outcome of the trial, and thus concluded that Anderson could not prevail on his ineffective assistance claim based upon this argument. *Id.* The district court said, "It may be advisable for an attorney to personally meet with his or her client before a capital trial to discuss the facts of the case, possible defenses, and to develop a rapport with the client. However, there is no evidence Ames' failure to do so, by itself, affected the outcome of the trial. . . ." [ER 03519].

The district court's analysis was correct. Under *Strickland,* Anderson's argument ultimately fails because he cannot demonstrate prejudice. Although Anderson implies that Ames's alleged failings in this regard might have influenced any discussions regarding the Blundell and Glashien homicides and whether to interview family and friends, he does little more than present generalized boilerplate claims of harm to the attorney-client relationship from this allegedly deficient representation. For example, Anderson states that Ames's failure "impeded the investigation of the [Blundell and Glashien homicides] in developing a case in mitigation." Blue Br. at 53. Yet, Anderson fails to identify any specific way in which his decisions or defense would have differed had Ames met personally with him in jail prior to trial instead of in court. Although Anderson's *Strickland* expert, Barry Levin, testified to his belief regarding what is necessary for a meaningful attorney-client relationship and the benefits of a meaningful attorney-client relationship, without requiring a demonstration of some specific prejudicial effect to this trial, a ruling in Anderson's favor would equate to a holding that an attorney's failure to meet with a client in jail prior to trial is *per se* prejudicial. Such a holding would make little sense, as *Strick-*

*land*'s relatively elastic standards make clear that there is no one correct formula for effective assistance in Sixth Amendment terms.

The evidence from the district court's evidentiary hearing also supports the conclusion that Ames did not deficiently represent Anderson at the first trial through his practice of delegating interviews to others and of meeting with Anderson in court. Ames testified that "whenever it became important for whatever reason my investigator would go out and talk to" Anderson at the jail, and that he himself "sometimes" visited Anderson in jail. SER at 2262. Ames testified that he "sat down with Mr. Anderson and reviewed all of the facts known to me regarding his case," SER at 2271–72, discussed his family history with him, *id.,* and discussed the Blundell and Glashien homicides with him, SER at 2319. In short, a review of Ames's testimony at the evidentiary hearing makes clear that Ames did not fail to discuss the case with Anderson at any point in the representation. *See, e.g.,* SER at 2262, 2271–72, 2319, 2333, 2339, 2348, 2351–53, 2440, 2453, 2545–48, 2572, 2617–19; Sealed SER at 180, 191–92, 200.

Anderson challenges the district court's reliance on Ames's testimony at the evidentiary hearing as clearly erroneous, arguing that his testimony is rife with statements both internally inconsistent and inconsistent with independent documents. After reviewing the entirety of Ames's testimony at the evidentiary hearing, there is nothing to suggest that Ames's credibility is susceptible to a legitimate attack. Where his testimony was inconsistent and/or uncertain, Ames repeatedly cited a lack of memory—perhaps understandably—due to questions focusing on specific actions, thoughts, and events occurring between twelve and sixteen years earlier. *See, e.g.,* SER at 2263, 2382, 2387, 2445, 2448A; Sealed SER at 199. Several witnesses at the evidentiary hearings suffered, not unexpectedly, from similar shortcomings of

memory as to at least part of their testimony. *See, e.g.,* ER at 2759–60 (Hall), 3043, 3046, 3048–49 (Harvey).

### 4. Ames's Closing Argument—First Trial, Guilt Phase

■ Anderson's second argument that Ames was ineffective focuses on Ames's performance during the closing argument of the first trial's guilt phase. Anderson alleges that Ames inexplicably conceded guilt and asked the jury to find him guilty of first degree murder. Anderson points out that such a request, in light of the jury instructions given at the first trial, was the equivalent of requesting that the jury find Anderson eligible to receive the death penalty. The district court concluded that Ames's closing argument "was not an unreasonable strategic choice given the options available," primarily because of the "Herculean task" that Ames encountered at the guilt phase of Anderson's first trial. ER at 3524–25.

Anderson argues that Ames's conduct during closing argument of the first trial's guilt phase should be presumed prejudicial under *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (companion case to *Strickland* holding that certain errors should be presumed prejudicial). *See United States v. Swanson,* 943 F.2d 1070, 1074 (9th Cir.1991) (applying *Cronic* exception to *Strickland* framework where defense attorney conceded no reasonable doubt concerning only factual issues in dispute and government fails to identify any strategy for such concession). It is plain that *Swanson*'s application of the *Cronic* exception should not govern this case. Ames made clear at the first trial, second trial, and evidentiary hearing that his statements during closing argument of the first trial's guilt phase were part of a strategy. ER at 1281; 1RT at 2629; ER 1285–89, 2010; SER at 2519–20, 2524–25, 2529, 2612–13. Thus, Ames proffered a strategic reason for the argument he set forth. Furthermore, Ames did not concede a lack of reasonable doubt on all factual issues, as the following discussion will demonstrate.

Prior to his closing argument, Ames asked for a jury instruction which would have read: "The defendant may be found guilty or not guilty of either or both of the offenses charged." ER at 1278–81; 1RT at 2629. However, in recognition of the prosecution's sole reliance on a felony murder theory for the Lyman homicide, the state trial court rejected this instruction. The court recognized that Ames's desired instructional language would have meant that the jury could find Anderson guilty of murder but not of burglary. ER at 1280. Ames explained why he sought this particular instruction:

> I could not ... in good conscience ... attempt to have any credibility with this jury in the penalty phase to argue to this jury based upon the evidence that we have with respect to diminished capacity to find him not guilty of both counts. I could have credibility by asking the jury if they find there is diminished capacity to the extent that a—that the specific intent to commit a burglary was not present, but to find him guilty of murder in the first degree; I would not lose any credibility with that argument in my opinion with the jury if we should approach a penalty phase, but I certainly would if I attempted to argue anything other than that, that is, turn Mr. Anderson loose on society ...

ER at 1281; 1RT at 2629. The trial court responded "[w]ell, I think your duty is to argue diminished capacity as shown by this evidence, and if the jury is satisfied ... then your credibility is not affected at all because the district attorney has chosen to rely only upon that theory." 1RT at 2629. Thus, prior to his closing argument, Ames knew that he could not argue, consistent with the jury instructions to be provided, for a conviction on first degree murder alone. Yet, he also predicted that the jurors would refuse a defense seeking complete acquittal.

Ames reasonably concluded that it was obvious that Anderson shot and killed Lyman. He also knew that, with a diminish-

ed capacity defense to burglary, he would be asking the jury to acquit on both the charge of burglary and first degree felony murder. Anderson could not be convicted of first degree felony murder without a conviction on the burglary charge. However, Ames understandably wanted to avoid the possibility of the death penalty for Anderson. With all of these factors combined, Ames made a strategic calculation: 1) he would defend the burglary on diminished capacity grounds; 2) and, recognizing the unlikelihood that the jury would be willing to acquit on the homicide and at the same time wanting to preserve some credibility with the jury for the penalty phase, which appeared to be a foregone conclusion, he would ask the jury to convict on first degree murder charges, but not on grounds of felony murder. In effect, what Ames sought was jury nullification; to convict Anderson for murder, but to do so outside of the bounds of the jury instructions, thereby saving Anderson the possibility of the death penalty. Had the jury done what Ames asked, his client would have been ineligible for capital punishment.

Ames began his closing argument by candidly discussing the facts of the case with the jury. He told the jury,

> [i]t must become apparent to you almost immediately that it was not a classic "who done it?" The person who killed Elizabeth Lyman on or about May 26 after you heard the first few witnesses it was apparent to you who—whose conduct was responsible for that. So I am not going to stand before you and say that my client didn't do any of these things. It must be fairly obvious to you that coupled with his own admissions on the video tape of the film and the audio tape, that he admitted his involvement with respect to the killing of Elizabeth Lyman. Rather than talk about the facts, I think that would merely be wasting all of our time in this courtroom.

1RT at 2651; ER at 1284. On their face, these words appear very similar to concessions of guilt in cases where this court has concluded counsel provided ineffective as-

sistance. *See Swanson,* 943 F.2d at 1071, 1076–78 (ineffective assistance where defendant pled not guilty and counsel stated that evidence was "overwhelming" and that he was "not going to insult the jurors' intelligence"); *see also Francis v. Spraggins,* 720 F.2d 1190, 1193–95 & n. 7 (11th Cir.1983) (pre-*Strickland* case holding ineffective assistance where, despite client's denial of participation in crime, counsel stated "I think he did, from the evidence that the State has put up, I think he went in the house and I think he committed the crime of murder probably"). Here, however, Anderson had provided a full admission to committing the homicide, and Ames's words prefaced a strategic closing presentation. *See Swanson,* 943 F.2d at 1075–76 ("We recognize that in some cases a trial attorney may find it advantageous to his client's interests to concede certain elements of an offense or his guilt of one of several charges.").

Next, Ames discussed the felony murder rule and its meaning in terms of the death penalty. ER at 1284–86. He noted the severity of the felony murder rule, that it was "kind of harsh" for all killings committed during a felony to automatically become murders. ER at 1285. He also admitted that it would be "just as harsh" to allow an admitted killer to get away with the killing because of a lack of intent on an underlying felony:

> Even if a person was mentally impaired to the point where he could not form the specific intent to commit a burglary, I think I could hear you all saying, "But what about the killing? We'll pass on the burglary part of it, but we sure want to convict him of murder and murder in the first degree." I mean, he told us he killed Elizabeth Lyman. You saw it on the screen.

ER at 1286.

Ames then said to the jury:

> I would like to be able to ask you, like to be able to tell you that the state of the law, his Honor would allow me to say that the law is such that you could re-

turn if you find him not guilty of burglary and find him guilty of murder in the first degree. I would like to be able to make that kind of argument to you.

ER at 1287. Ames informed the jury that, unlike standard first degree murder, first degree felony murder opened the door for a possible death sentence. *Id.* Again, he acknowledged the likelihood that "[t]here is no question in your mind as to Stephen Wayne Anderson's conduct on May 26, 1980. Whether he is guilty or innocent depends upon the law of diminished capacity." ER at 1287A.

After discussing the evidence of diminished capacity in the case, Ames closed with another attempt at jury nullification:

Remember we talked about the harshness of the felony murder rule where someone causes a death and that person is guilty of murder in the first degree, notwithstanding that the causation was accidental; that is the law, and the reverse side of the coin is the harshness to the family and friends of Elizabeth Lyman if the person did not have the specific intent to commit a burglary, there is no culpability for the killing of Elizabeth Lyman.

Like I told you earlier, I would like to ask you to convict Stephen Anderson of murder in the first degree. That is one of the possible verdicts in this case. If the law allows me to ask you to do that, I am asking you to convict him of murder in the first degree as [the prosecutor] is, but not on the basis of the felony murder rule because, you see, I would agree with that verdict and I would also applaud that verdict because it would not put me in a position at some later time to ask the twelve of you to spare the life of Stephen Anderson.

ER at 1288B–1299. Again, at this time Ames already knew that the trial court had rejected his requested jury instruction. Thus, he knew that the law did not "allow[ him] to ask [the jury] to do that," *i.e.* convict of first degree murder on a non-felony murder basis. Nevertheless, given the "highly deferential" review on an·

ineffective assistance claim and the "strong presumption" that Ames's efforts fell within the "wide range of reasonable professional assistance," *see Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, we conclude that Ames's closing argument was a "strategic choice" that survives under *Strickland.*

In hindsight, it is very easy to criticize Ames's closing argument as risky. Yet, it is not whether Ames won or lost, it is how he played the game that counts. The rules of Ames's game came with an incredible slant in the prosecution's favor. Anderson had admitted everything. Ames made a reasonable decision that his only hope for a defense centered on diminished capacity. He also made a reasonable assessment that the jury would be very unlikely to let Anderson off of the hook completely. Ames predicted that there was bound to be a penalty phase of some sort in Anderson's case.

Ames hoped that any penalty phase would not involve the death penalty. Under the instructions given in the case, however, this was not possible. If the jury found Anderson guilty by following the law as it was presented to them, the death penalty would be involved in a penalty phase. Thus, in order to avoid the prospect of the death penalty under the court's instructions to the jury, Ames would have been forced to argue for a complete acquittal. Such an argument, Ames decided, would hurt his cause when it came time for the penalty phase. ER at 1281; 1RT at 2629.

With the amount of solid evidence facing Anderson, Ames's chosen diminished capacity and jury nullification argument is not demonstrably worse than an argument centered on diminished capacity and complete acquittal. *But cf. Capps v. Sullivan,* 921 F.2d 260, 262 (10th Cir.1990) ("[W]hen a defendant takes the stand in his own behalf and admits all of the elements of the crime, exactly in accord with the court's instructions to the jury, it is surely inadequate legal representation to hope that the jury will ignore the court's in-

structions and acquit from sympathy, *rather than to raise an entrapment defense that has some support in the evidence.*") (emphasis added); *Francis,* 720 F.2d at 1194 ("Where a capital defendant, *by his testimony as well as his plea, seeks a verdict of not guilty,* counsel, though faced with strong evidence against his client, may not concede the issue of guilt merely to avoid a somewhat hypocritical presentation during the sentencing phase and thereby maintain his credibility before the jury.") (emphasis added). Ames simply found it "advantageous to his client's interests to concede ... guilt of one of several charges," *see Swanson,* 943 F.2d at 1075–76, and attempted to do so under one of two similarly risky strategies.

 Even if Ames's closing argument demonstrates deficient performance, however, we conclude nevertheless that Anderson flunks the prejudice component of the ineffective assistance test. Anderson simply cannot demonstrate that there was a "reasonable probability" that the result of the trial would have been different had this argument not been made. *See* Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Ames's alternative of arguing for a complete acquittal would have been founded upon an unstable foundation of diminished capacity evidence and very likely would not have prevailed given the mountain of evidence against Anderson.

5. Ames's Defense Against the Death Penalty

The prosecution's case for the death penalty can be summarized as follows:

17) Anderson was a cold-blooded murderer who intentionally and wantonly killed a defenseless elderly woman at close range in her own home so that he could steal her money and eat her food.

18) The murder of Lyman was just another violent act in the short but dangerous life of Anderson, as first demonstrated in 1971 with his armed burglary of a school in Farmington, New Mexico, during which he used a rifle to threaten the lives of two peace officers.

19) Anderson's wanton violence continued even after he was incarcerated for the Farmington burglary as evidenced by his conviction for aggravated assault with a knife on a fellow prisoner.

20) Undaunted by his conviction for stabbing one prisoner, he then knifed another prisoner, Blundell, to death on August 24, 1977.

21) He then effectuated a successful walk-away escape from Utah State Prison, and shortly thereafter shot and killed Timothy Glashien for $1,000.

22) Anderson told the detectives that, "I was born and trained to be a killer. I always wanted to be a killer."

In his opening argument to the jury after the evidentiary phase of the trial, the prosecutor summed it up this way:

So remember that when you consider what he's done and what he's testified to.

This particular individual is a sociopath. He cannot live with anybody. He cannot get along with anybody.

He kills people everywhere. He stabs people everywhere.

He has stabbed an individual in prison. And you'll have the court documents that shows where he pled guilty. And he admitted that while in the Utah State Prison sitting in a movie he stabbed an inmate there.

And as a result of that stabbing he was convicted of aggravated assault by a prisoner with a deadly weapon.

He stabbed Mr. Blundell and killed Mr. Blundell while he was in prison. He admitted that he killed him.

He told you that just before he came down here from San Quentin he got into a fight with the people in San Quentin and his housing was changed because he was fighting.

There is no place that anybody is going to be safe from this individual.

He looks out for old number one, and that's all he's concerned with. And forget about the rest of the world.

Let me talk to you a little bit about this weighing process and some of the things that I think you. . . .

■ Needless to say, an examination of the entire transcript of both aspects of Anderson's second trial indicates that the State's case was very powerful. Nevertheless, the record reveals also that Anderson's two attorneys, in league with their death penalty expert Dr. Linda Meza, crafted—with what they had to work—a coherent, emotional, passionate, and strong case of their own.

The genesis of Anderson's defense, it turns out, began long before his second trial, as revealed by Dr. Meza's post-trial letter to the jurors requesting access to them. This letter was read to the jurors in open court by Ames' co-counsel Ms. Bonnie Harvey. It contains the following information that reflects on the defense's preparation, strategy, and presentation:

I assisted Don Ames in the jury selection process in Stephen's first trial. After the trial ended I conducted a comprehensive study of the decisions you're making, which included the discovery of what the jury considered to be major gaps or unanswered questions in Stephen's first trial.

Stephen's first trial—the link in Stephen's first trial was the absence of Stephen's participation in his own behalf.

I learned from that jury that their experience was agonizing, and yet they felt that no alternative to death—and yet felt—they felt no alternative to death because Stephen never came forward.

This revelation from the first jury sheds light on and explains much of the defense's ultimate strategy in the second trial, which was to build their case around their client's personal testimony, and to cast his behavior in a less culpable light. They would present Anderson as a person whose acts of violence were the product not of a blood thirsty personality, but of unspeakable and horrible events visited upon him by others in his past life. In so doing, they would try to humanize him. Moreover, they would deny or explain away much of the prosecutor's case.

The problem Anderson's attorneys faced with this defense was most unusual: (1) their client would not fully go along with it unless he could present the most compelling part of it in a closed and sealed session without the presence of the media or the public, and (2) he did not agree to it until after the penalty phase had started. Up until that moment, he had instructed Ames not to refer to the sealed incident. At that crucial juncture, the attorneys had to convince the trial judge to close the courtroom at various times during the trial. This difficult task included fending off attorneys for the media who contested the closure order. Moreover, it leaves this court with a difficult task because we are not able to refer to the substance of Anderson's case presented at his request in closed session to explain our conclusion that his attorneys rendered for him effective assistance as required by the Sixth Amendment.

In any event, the special circumstances and then the penalty phase defense boiled down to this:

A. The shooting of Elizabeth Lyman was an accident. Anderson had indeed cased her house for three days before the burglary, but at the time he entered, he believed no one was home. The shot he discharged was fired out of surprise, and he did not intend to kill her. He was shocked when he discovered what he had done. Moreover, he did not callously sit down for dinner after the shooting. About this allegation, the police were not telling the truth.

B. As to the Farmington burglary in 1971, the officers were lying when they said he pointed a rifle at them.

He did have a rifle, but it was lying on the floor when they surprised him. He was never charged with, nor convicted of, pointing the rifle at the officers, only of the school burglary. In any event, no violence was involved in the incident—on that point, even the officers agreed.

C. He did kill Blundell, but he did it in self-defense against Blundell's aggression. Moreover, he was not charged with nor convicted of this alleged crime. However, we are unable to discuss the essence of this part of the defense without violating the order to seal the record. Suffice it to say, we find the evidence in this regard to have been well-prepared and skillfully and forcefully presented to the jury by Ms. Bonnie Harvey. This evidence in mitigation could well have explained why the jury took almost three weeks to reach a verdict. The prosecution did not dispute the basic facts of this sealed evidence, and if believed, it is very compelling. The sealed evidence was also used by the defense to explain to the jury why Anderson did not tell the officers the whole truth about the Blundell incident.

D. He did not kill Timothy Glashien, although he was part of the group responsible for Glashien's murder. The actual killers were the people who harbored him and helped him effectuate his walk-away escape from Utah State Prison. He confessed to the Glashien homicide to take the heat off the real killers in repayment of his debt to them. However, he would tell no one who the killers were out of a sense of loyalty. No doubt this silence made it difficult for anyone to verify his story. Also, the sealed evidence was used to cast his walk-away escape from prison in a more favorable and understandable light.

E. As a prelude to all of this, Anderson explained in great detail to the jury how he got onto the wrong track as a young teenager. It started when his mother, a court clerk, was falsely accused, convicted, and imprisoned for embezzlement from her court. She was released after suffering a heart attack and after the authorities discovered that she was innocent. The thief, it turned out, was the judge for whom she worked. His mother never recovered from the trauma of this false conviction, and she died soon thereafter of cancer. Anderson testified that he was branded by schoolmates over this event who taunted him with all sorts of derogatory names such as "Tweety Bird," and "Son of a Jail Bird." He testified also that this was a cataclysmic episode that altered his view of the world and of the justice system, and that thereafter he ran with the wrong crowd. The prosecution did not refute this compelling testimony, testimony that presented his mother as an extremely sympathetic and blameless victim.

F. Finally, the defense presented Anderson as a man changed by his five years on death row. To put this transformation in context, they called to the stand Byron Eshelman, a prison chaplain with 43 years experience working in such prisons as Alcatraz (3 years) and San Quentin (20 years). This experience included being an evaluator for San Quentin's Prisoner Evaluation Committee. Chaplain Eshelman testified as to the value of "lifers" to the prison system and that he believed Anderson to have much promise as a "changed man" in that capacity. The defense bolstered this strategy with Anderson's own testimony and the extensive prose and poetry he had written in prison. We note here that Anderson is apparently an intelligent man with an IQ of 136, and he has obvious talents as a writ-

er. Chaplain Eshelman testified that "Stephen has a lot of talents that he shared with me that have grown out of his past experience that would fit right into many of the great needs we have in prison [Tr. 4558] ... and he expressed a form of insight and feelings that I felt were quite remarkable. He had a sense of contrition and penitence [a]nd a feeling of remorse that is really quite rare and important." [Tr. 4559]. Anderson himself testified that "the experience of being condemned to die made me grow up and realize that it was a serious matter. And I matured. And I realized there's more to life than living the life that I had lived. And maybe I had a chance to change." [Tr. 4665].

In choosing this defense and this strategy, Mr. Ames and his defense team explored all the usual defenses to murder cases and to the death penalty. In addition to Dr. Meza, he consulted with and used many medical and mental health experts. However, Ames's defense strategy was hampered by his client's own restrictions as to what he would allow on his own behalf. Anderson's ground rules as well as the medical expert's problematic opinions clearly circumscribed the defense. As Ames explained during the first trial,

> Your Honor, at this time I would like the record to reflect that I have throughout this trial, both the guilt phase and now the penalty phase, I have consulted with my client, Stephen Anderson, and he has participated in many of the decisions that I have made. With respect to the penalty phase, I have discussed the calling of certain witnesses on his behalf for this phase of the trial. And particularly his closest relatives, that is, his father and his brother. The defense has investigated and has had some investigators talk with both the father and the brother in the state of New Mexico. My client reports with respect to—my client has reports with respect to those interviews, my client

Stephen Anderson has urged me not to call those witnesses, not to call his brother, not to call his father as witnesses in the penalty phase. For reasons known to him and to his counsel, or to—or to his counsel, I have acceded to Mr. Anderson's desires with respect to those two witnesses. There are other witnesses that could possibly have been called. For instance, Mr. Anderson fathered two minor children, the mothers, once again, known to the defense personally. I have talked to them in Salt Lake City, Utah. My investigators who investigated the case have made reports with respect to those witnesses. We have, after consulting with Mr. Anderson, chosen not to call those people as witnesses in the penalty phase at the request of the defendant. So if the record has been silent to this point with respect to witnesses that we may have called, I would like the record to reflect that there is no reason we—we didn't, and I don't feel the need or compulsion to disclose the reasons on the record with the exception that they were all at the request of the defendant in this matter, Stephen Anderson; whose IQ, by the way, as testified to by the doctor, is over 130 and who I felt throughout this case has been able to cooperate with counsel and has listened to me and in— and I in turn have listened to his desires.

■ [Tr. 2547]. Ames testified at the district court's evidentiary hearing that his client's restrictions remained in place for the second trial. Moreover, we have examined the evidence Ames and his new team learned from their investigative trips to New Mexico and to Utah and found nothing that would assist the defense given the prosecution's failure to contest Anderson's testimony about his childhood. There is no constitutional requirement to corroborate testimony that goes unchallenged.

As far as a defense based on diminished capacity caused by the ingestion of alcohol,

Ames tried such a defense at the first trial, but it failed because of a lack of supporting evidence. Indeed, the evidence pointing to a lack of diminished capacity was very powerful. Accordingly, Ames made the tactical decision before the second trial to abandon this approach. [Tr. 2419]. Instead, he called two medical experts to try—unsuccessfully—to convince the jury that the shooting of Lyman was a reflex action, i.e., not intentional.

We note that Ames' primary expert in this regard was originally supposed to be Dr. Forbes. However, Anderson made a damaging statement to her that made Ames decide to drop her from the witness list. Anderson told Dr. Forbes that in the past, he had caught a bird and crushed the bird to death in his hands. He told her that from this incident "he realized how easy it was to kill a living being." [Tr. 2604]. No one can fault Ames for substituting other doctors—Drs. Thompson and Beaber—for Dr. Forbes.

■ On appeal, Anderson's new counsel focuses first on Ames' credibility at the habeas evidentiary hearing, alleging that Ames' testimony was inconsistent, full of contradictions, and self-serving. Counsel argue that Ames' claim of strategic and tactical bases for his trial decisions is not worthy of belief. The problem with this claim is that it was rejected by the district court, who counsel admit credited Ames' stated reasons for his alleged "deficiencies." As an appellate court, we grant considerable deference to such credibility findings by a trial court. Unless they are clearly erroneous, we leave them as we find them and apply the law accordingly. Here, the district court's findings are well supported by the record and certainly are not clearly erroneous.

■ Next, counsel fault Ames and his team for an insufficient investigation of Anderson's background with respect to possible additional mitigating evidence. Appellate counsel refer us to a body of information developed in the evidentiary hearing to the effect that Anderson's mother and father mistreated him severely as a child, and that he suffered other related psychological trauma while growing up.

The first problem with this argument as recognized by the district court is that even if it is true, Anderson kept it from his trial attorneys, telling them instead as he testified at the trial that his father was "a good man," a "fair" man who was gone a lot because of his work. Anderson said also that he got along all right with his mother. The second problem with this line of evidence is that it undercuts the very respectable and sympathetic picture painted by Ames of Anderson's mother Goldie. To the jurors, she was the venerable mother, wronged and imprisoned because of a crooked judge; and the defense's claim was that this terribly unjust episode explains and mitigates Anderson's crooked youthful turn in the road. The new defense team now says that in reality Goldie Anderson, even before her wrongful conviction, was mentally disturbed, unable to function, mean, abusive, suicidal, homicidal, and jointly responsible for a reign of terror in her household. In our judgment, Anderson was better served by Ames' presentation of Goldie as a sympathetic person, not an out-of-control monster. The two pictures of a monster and a wrongful convicted person might be woven together in one coherent tapestry, but on the other hand, one might argue—if one credits this new evidence—that Anderson was better off with his mother not in the home. In any event, it is not at all clear that this evidence could have helped Anderson better than the defense chosen by Ames and Harvey.

As the district court found, "Despite being interviewed several times by various members of the defense team, Anderson did not disclose information relating to physical and emotional abuse as a child.... Given the withholding of information by Anderson, his father, and his brother, the Court cannot find Ames deficient in his investigation of the abuse issue." [ER 02546] Neither can we.

Appellate counsel also fault Ames for not developing an alibi, or an I-didn't-kill-him defense, with respect to the killing of Blundell. New counsel claim that competent trial counsel would have developed such evidence as an alternative to having Anderson take the stand and admit the homicide. There are many problems with this argument.

First, the core of the defense strategy became calling Anderson to the stand. This decision stemmed from the first jury's reaction to his failure to testify.

Second, Anderson admitted killing Blundell, both to Ames and Harvey and to the jury. It borders on the ridiculous to claim that Ames should have tried to prove an untruth, especially when Anderson was prepared before the jury to accept responsibility for this crime.

We note here the Supreme Court's reminder in *Cronic* that "the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Cronic*, 466 U.S. at 656 n. 19, 104 S.Ct. 2039. Ames believed that Anderson did kill Blundell, and to attempt to manufacture evidence to the contrary would be a "fraud on the court."

Third, the sealed testimony, one of the most powerful aspects of the defense, could never have gotten to the jury if Anderson did not testify.

As to the Glashien murder for hire, appellate counsel argue that Ames should have developed evidence to corroborate Anderson's recantation. However, Ames testified based on the overwhelming evidence that he still believed his client to have committed the murder, and that it would not have helped his client to call on his behalf his criminal confederates, who, after all, were untrustworthy thugs, murderers, and drug dealers. Moreover, Anderson refused to name his confederates or the actual killer. On the face of it, this refusal left Ames hamstrung. The moment Anderson named the real killer, the prosecution would be in a position to disprove the allegation, leaving Anderson high and dry. To us, Anderson's defense to the Glashien confession looks just as good—if not better—with no details. In addition, Ames reasonably believed that even if Anderson had not administered the fatal shots, he still could be guilty by his own admission of the murder as an accomplice. In any event, the firearms evidence was conclusive that the same gun that killed Elizabeth Lyman also killed Timothy Glashien. To argue as do counsel that "aside from Anderson's confession, the only evidence linking him to the Glashien homicide was ballistic evidence indicating that a gun taken from Anderson when he was arrested for the Lyman homicide was used in the Glashien homicide" is like arguing that aside from a declaration of war, the only thing connecting Japan to the beginning of the war in the Pacific was Pearl Harbor. Finally, assuming the truth of his Glashien recantation, Anderson's refusal to identify the real killers so they could be brought to justice is hardly a factor in mitigation. If anything, it undercuts his claim to rehabilitation and being a new man. He was trapped coming or going: either he killed Glashien, or he was obstructing justice in his trial five years later so the real killers could escape. This trap was of his own making.

Anderson levels a battery of allegations against Ames for delegating Anderson's testimony during the penalty phase to his co-counsel Ms. Bonnie Harvey and for their joint failure to prepare him to testify. The core of these allegations involve Ms. Harvey's recent admittance to the bar, her relative lack of experience, and her performance during the trial. We begin our analysis of these charges from the proposition that a defense attorney is not presumed to be ineffective simply because that attorney is young, inexperienced, and has never before tried a jury trial. "The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it

does not justify a presumption of ineffectiveness in the absence of such an evaluation." *Cronic*, 466 U.S. at 665, 104 S.Ct. 2039. The main problem with these charges then, is that her actual performance in the courtroom, as indicated by the trial transcript, was not subpar. Her examination of Anderson during the sealed part of the trial was obviously well-prepared, thorough, and compelling—as was her passionate heartfelt summation to the jury.

Moreover, Ms. Harvey was the member of Anderson's team that devised the neurological reflex defense used during the special circumstances retrial. We note also that Ms. Harvey developed a rapport with Anderson, and that Anderson literally demanded that she be the one who should handle his testimony, not Ames. Ames himself was concerned about Ms. Harvey's inexperience, to the point of being openly opposed to allowing her to conduct Anderson's examination; but Dr. Meza testified (1) that she educated Ames "on the necessity for the client to have total trust in the party conducting the direct examination," and (2) that she convinced Ames to allow Ms. Harvey to take on this task. At the evidentiary hearing, Ames elaborated on the circumstances surrounding this decision and the reasons for it:

A. (By Ames) [Anderson] did not want me to examine him. In fact, he balked at that completely. And the only way that that information and the subsequent mitigation for the Blundell murder we—the only way the jury would gain that information was if Bonnie Harvey was the one who posed the questions to him, and he made that an absolute condition of his testimony.

Q. Now, Ms. Harvey had primary responsibility to prepare Mr. Anderson to testify?

A. We all did. I can recall the four of us in the judge's library, the doors locked and closed to anyone, and we spent a lot of time going over his purported testimony with him. And Bonnie Harvey would rehearse him,

that is, the kind of questions she would ask him so he could come up with the answer that only he knew. But we had all the time we needed to prepare him for that testimony.

Q. Well, after the decision was made to call Mr. Anderson, however, Ms. Harvey took primary responsibility for preparing him; isn't that correct?

A. Preparing him?

Q. Yes, to testify.

A. No, we all did. Linda Meza, Bonnie, and me, we all did. But Bonnie had the responsibility for asking the questions and conducting the examination with Stephen Anderson, but we all participated in preparing him for his testimony, not telling him what to say, but to acquaint him with the questions we would ask. When I say we would ask, I mean that Bonnie Harvey would ask. She was the only questioner.

. . . . .

Q. And Ms. Bonnie Harvey put together the argument to the jury regarding this incident; correct?

A. Yes. And I might add that Ms. Harvey did not come by way of this examination incidentally. She examined him and made the argument to the jury because Stephen Anderson wanted her to, did not want me to, but wanted the softer touch of a woman in explaining this and making this argument to the jury. It was his decision that Bonnie Harvey conduct the examination.

. . . . .

Ms. Harvey had developed a rapport between herself and Mr. Anderson. Ms. Harvey was married to a doctor in the community whose build resembled Mr. Anderson's, and she would bring her husband's sweaters and various sundry clothing for Mr. Anderson to wear during the trial. It was chilly

in the courtroom and he was dressed in civilian clothes all the time, and Mrs. Anderson—strike—Mrs. Harvey, would bring her husband's clothing for him to wear. And there was a great deal of rapport between the two of them.

As indicated, the key to Anderson's testimony was that the courtroom be closed to the public and the press. Without this secrecy, Anderson would not take the stand. Ames and Ms. Harvey took on this difficult assignment together, and they prevailed over stiff opposition. It is rare that a trial judge will close a public courtroom, but Ames and his co-counsel won that battle in this case and succeeded also in permanently sealing the record of the closed proceedings. We note that Ames told the trial judge that he was prepared to seek a "writ" from California's Fourth District Court of Appeal and the "Supreme Court," if necessary to accomplish his objective. [Appellee's Sealed SER at 10].

In any event, much of the Appellant's counsels' evidentiary hearing offerings—or should-have-dones—were found seriously wanting by the district court. For example, the court found the declaration of Dr. Raynold Bruce that Ames should have employed a mental health expert and social historian to be unpersuasive or not credible. The court deemed Dr. Bruce's declaration to be "making more than a recital of a less-than-objective creation by counsel." [ER 03544]. The court dismissed other "expert" testimony as opinion and information based on hearsay. Moreover, he found Dr. Meza's testimony on behalf of Anderson to be "not believable," simply an advocate's "hyperbole and exaggeration." The record supports these adverse findings, which leave Anderson's appellate case on this issue on thin ice.

Finally, Anderson's counsel fault his trial team for failing to develop evidence to corroborate the sealed incident related by Anderson on the stand. The problem with this charge is that Anderson's credibility on this issue was never attacked, as current counsel admitted when pressed at the evidentiary hearing. We decline to quote from this part of the sealed record, but note that if a prosecutor does not challenge a defense witness's credibility with respect to certain evidence, there is no need for corroboration.

The district court was impressed with the force of the defense that Ames and his team did choose. The court found no Sixth Amendment deficiencies in Anderson's representation, and neither do we. Ames' defense of his client impressed also the state trial judge. At one sticky point in jury deliberations, when one juror was relieved in favor of an alternate, Ames demonstrated commendable skill in protecting his client's right to have the jurors throw out their previous deliberations and start all over again. When Ames succeeded in convincing the trial judge of the soundness of his motion, the judge said,

THE COURT: Yes. I have to commend you, Mr. Ames. As always you being one of our most skilled death penalty trial attorneys, you not only know the rules and you do your homework very carefully, but you consult authorities in the field all over the state whenever you have a problem. So you always seem to be abreast of the situation.

Yes. I will admonish the jury under *People v. Collins,* [17 Cal.3d 687, 693–94, 131 Cal.Rptr. 782, 552 P.2d 742 (1976).]

Later, in connection with Anderson's sentencing, the same judge said,

I have to admit from all of the evidence that I have heard in this case, from my observations during the trial of the defendant and of the other witnesses, that the defendant received a fair trial.

He had excellent representation. Every possibility that could be explored was explored.

The facts remain that the defendant is guilty of a cold blooded murder.

As the district court noted, we must "resile from present counsel's attempt to lure us into the hindsight miasma that the

Supreme Court has told us to avoid." *Smith v. Stewart*, 140 F.3d 1263, 1273 (9th Cir.1998). Could the defense in this case have been finer? Sharper? Maybe so. But with the possible exception of Mozart's Jupiter, Beethoven's Fifth, and Michaelangelo's David, most every creation or labor wrought by humankind is susceptible of refinement and improvement. All in all, it is our judgment that although it failed, the defense provided in this case by the team of Donald Ames and Bonnie Harvey along with their team of expert consultants and witnesses well satisfied the demands of the Sixth Amendment, i.e., it was within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

Furthermore, the district court concluded that even had Ames done what present counsel suggests, the result would be no different. The State's case was simply too strong. Because Anderson can show no prejudice to his defense, we agree.

# VI

## *Premature Jury Deliberations*

 Next, Anderson contends that the jurors engaged in premature penalty phase deliberations, thereby violating his Sixth Amendment right to a fair and impartial jury. Blue Br. at 89–91. Anderson bases this argument on the fact that, before the jury began its penalty phase deliberations, one of the jurors, Valerie Lichtman, wrote a note to the judge asking "Does life without possibility of parole really mean that? Or can Anderson, under the sentence, at some future time be released?" ER at 2238, 2395. This claim is without merit.

 "It is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body." *United States v. Resko*, 3 F.3d 684, 688 (3d Cir.1993). Thus, when jurors prematurely discuss the case among themselves, it may amount to juror misconduct.

*See, e.g., United States v. Bertoli*, 40 F.3d 1384, 1392–96 (3d Cir.1994); *Resko*, 3 F.3d at 688–89; *United States v. Conn*, 716 F.2d 550, 551–52 (9th Cir.1983). However, not every incident of juror misconduct requires a new trial. *United States v. Klee*, 494 F.2d 394, 396 (9th Cir.1974). "The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Id.*

In the case at bar, the district court found that Anderson failed to establish that the jury was engaged in premature deliberations. ER at 3622. In the district court's view,

> [t]he Lichtman note is evidence that one juror was contemplating the possible sentences. Anderson's contention that the note implies an exchange between two jurors about the meaning of life without the possibility of parole is speculative.

ER at 3622. Accordingly, the court rejected Anderson's claim that his Sixth Amendment rights had been violated.

On appeal, Anderson asserts that this finding by the district court is clearly erroneous because "Lichtman stated under oath that she wrote the note while deliberating with other jurors, and that other jurors were present when the note was drafted." Blue Br. at 90. This is not exactly true. Lichtman stated the following under oath:

> I recall writing the note dated 1–21–86, which has been shown to me by investigators from the Federal Public Defenders office. I recall writing this note during deliberations in the jury room. The other jurors were present in the room when the note was drafted. *I may have discussed this matter with other jurors. However I don't recall for certain.*

ER at 3699 (emphasis added). It is therefore unclear whether Lichtman wrote the note "while deliberating with other jurors."

In any event, Anderson's claim must fail because there is absolutely no evidence

that the alleged misconduct has prejudiced Anderson in any way, much less "to the extent that he has not received a fair trial." *Klee,* 494 F.2d at 396. Anderson does not contend that any of the jurors relied on evidence outside of the record in reaching their verdict, nor does he assert that any of the jurors actually decided on the death penalty before the case was submitted to them. We affirm the district court on this issue.

## VII

### *Denial of Request for Protective Order*

 Anderson's last claim on appeal is that the district court erred in denying his request to limit the use of attorney-client communications and attorney work-product materials produced in the federal habeas proceedings to such proceedings. Anderson requested the protective order to prevent the prosecution from using the material in any subsequent state re-trial. This court generally reviews discovery orders for an abuse of discretion. *Wharton v. Calderon,* 127 F.3d 1201, 1205 (9th Cir.1997).

At the time the parties filed their respective briefs, the three-judge panel's decision in *McDowell v. Calderon,* 173 F.3d 1186, 1191 (9th Cir.1999) (*opinion withdrawn by order of the court and supplanted by McDowell v. Calderon,* 197 F.3d 1253 (9th Cir.1999) (en banc)), was the law of this circuit. *McDowell* reversed a district court's order limiting use of attorney-client material produced on federal habeas review to such proceedings and held that, under *Wharton,* 127 F.3d at 1205, the court abused its discretion and improperly interfered with the prerogatives of state courts by issuing the protective order. *Id.* at 1191. Both Anderson and the State agreed that *McDowell* controlled, and Anderson stated that he was raising the issue simply to preserve it for review. Blue Br. at 92. Neither party presented any specific arguments on the issue.

Since the initial briefing in this case, however, the panel's decision in *McDowell* was reversed by this court sitting en banc.

*McDowell v. Calderon,* 197 F.3d 1253, 1255–56 (9th Cir.1999) (en banc). In its decision, the en banc court considered only whether the district court properly denied the government's motion to reconsider the order limiting use of the attorney-client material and held that "the question being a debatable one, the district court did not commit clear error when it limited access to the file pursuant to the terms of the protective order." *Id.*

Here, the district court denied Anderson's request for a protective order limiting use of the attorney-client materials to federal habeas proceedings on the grounds that the issue was one of evidentiary privilege that was more appropriately decided in state court if a re-trial actually became necessary. *See* ER at 1158–59; *see also Wharton,* 127 F.3d at 1205.

 The controlling law on this issue is straightforward and uncomplicated. It is the law of this Circuit that when a petitioner in a habeas corpus action raises a Sixth Amendment claim of ineffective assistance of counsel, he waives the attorney-client privilege as to the matters challenged. *Wharton,* 127 F.3d at 1203. Moreover, the "privilege is an evidentiary rule designed to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer." *Id.* at 1205 (quoting *United States v. Rogers,* 751 F.2d 1074, 1077 (9th Cir.1985)). The rule does not apply where there is no "forced disclosure of a confidential communication in a judicial proceeding." *Rogers,* 751 F.2d at 1077. "Thus, a court's authority to 'protect' the attorney-client privilege simply does not extend, at least absent some compelling circumstance, to non compelled, voluntary, [disclosures], any more than it does to an after-dinner conversation. The attorney-client privilege is a rule of evidence." *Wharton,* 127 F.3d at 1205.

Under these circumstances, we conclude that the protective order requested by Anderson's attorneys would constitute an unwarranted anticipatory interference with

the prerogatives of the state courts. The protective order would effectively enjoin California courts from adjudicating a state law issue concerning Anderson's waiver of the attorney-client privilege and constitute a request that the district court retain continuing supervisory jurisdiction over the conduct of any retrial in state court. Such an unprecedented order would contravene basic principles of comity and federalism. As the Supreme Court said in *Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), "the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *See also Perez v. Ledesma,* 401 U.S. 82, 84–85, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971). ("[T]he admissibility of evidence in state criminal prosecutions [is] ordinarily [a] matter[ ] to be resolved by state tribunals ..., subject, of course, to review by certiorari or appeal in [the United States Supreme] Court or, in a proper case, on federal habeas corpus."); *Stefanelli v. Minard,* 342 U.S. 117, 120, 72 S.Ct. 118, 96 L.Ed. 138 (1951) ("[F]ederal courts should refuse to intervene in State criminal proceedings to suppress the use of evidence even when claimed to have been secured by unlawful search and seizure."); *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). And as the Court said in *Pitchess v. Davis,* 421 U.S. 482, 490, 95 S.Ct. 1748, 44 L.Ed.2d 317 (1975), "Neither Rule 60(b), 28 U.S.C. § 2254, nor the two read together, permit a federal habeas court to maintain a continuing supervision over a retrial conducted pursuant to a conditional writ granted by the habeas court."

Accordingly, the district court correctly denied Anderson's request for a protective order.

AFFIRMED.

**1.** This interview was never listed in the sheriff's log of interviews and Anderson's attorney did not know about the interview during the time he represented Anderson. Although I conclude that Anderson invoked his right to silence, I believe that the invocation was not

McKEOWN, Circuit Judge, Dissenting:

The prosecution's penalty phase case rested on Mr. Anderson's confessions to the Utah killings and the psychiatrist's interview with him. This evidence was obtained from Anderson while he was held for 76 hours in a California jail without the benefit of an arraignment hearing, and in violation of *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). The chain of events began when Anderson affirmatively declined to answer investigators' questions about the Utah killings, instead telling them that "silence is [a] virtue."[1] At that point, the police could have proceeded to arraign him on the murder charge for which he had been arrested, but they did not. Instead, police held him in custody until Utah officials could travel to California. No matter how you slice it, Anderson's continued confinement without arraignment was for one purpose-to investigate the Utah murders in the hope of getting a confession from Anderson. The majority recognizes these circumstances but holds that suppression of this evidence is not warranted as "fruit of the poisonous tree." I conclude otherwise. In this instance the apple did not fall far from the tree, which was tainted by the *McLaughlin* violation. The majority has given Mr. Anderson a Fourth Amendment right without any remedy. Our precedent and fairness dictate a different result. I therefore dissent on this point. I join the remainder of the majority's thoughtful analysis and conclusions.

## I. McLAUGHLIN VIOLATION

The majority concludes, and I agree, that the state violated Anderson's Fourth Amendment rights. *McLaughlin* makes clear that if a probable cause determination does not occur within 48 hours of

so unequivocal that further questioning violated *Miranda v. Arizona,* 384 U.S. 436, 457, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Therefore, I join in the majority's analysis of Anderson's *Brady* claim with respect to this statement.

arrest, the government has the burden of demonstrating the existence of a bona fide emergency or other extraordinary circumstance. 500 U.S. at 57, 111 S.Ct. 1661. The *McLaughlin* violation in this case, however, was not due to emergency, neglect, or even the mere passage of time.

Here, Anderson was arraigned over three full days after his arrest—a delay for which the state was unable to provide any valid justification. In fact, the police did not need to investigate further before charging Anderson. They already had his confession to the Lyman murder. Nor, as they admit, did they need the Utah information for their initial charging decision. As it turns out, they did not even charge him with a capital crime for another two months.

Anderson was arrested in the early morning of May 26. At 7:04 the same morning, he told police that he did not want to answer any questions about Utah. Anderson was placed in isolation and held without a probable cause determination until Utah officials could arrive and question him about other killings, and until a psychiatrist could interview him. Police held him knowing that Anderson, in the meantime, would not see a lawyer. They did so knowing that he would not see a judge. It wasn't until two days after his arrest, on May 28, that Utah authorities arrived to interview him. On the evening of May 28, the prosecutor arranged for an interview by Dr. Flanagan, a psychiatrist employed by the California Department of Corrections. Anderson was not arraigned until the following day, May 29. Nothing happened in the time between arrest and May 29 that would have prevented a timely arraignment. Only after Anderson confessed to Utah police, and made incriminating statements to the psychiatrist, was his case brought before the court for a probable cause determination that was over 28 hours overdue.

Suppression of evidence is an appropriate remedy for a *McLaughlin* violation if it is the "fruit of the poisonous tree" under *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In *Brown*, the Supreme Court identified a two-part suppression analysis: First, as a threshold matter, if the statement was involuntary, it is inadmissible. *See id.* at 601, 95 S.Ct. 2254. Second, if the confession was voluntary, then the court must apply a four-factor test. That test aims to determine whether the police obtained the confession by exploiting the Fourth Amendment violation, or if the confession was "sufficiently an act of free will to be purged of the primary taint." *Id.* at 602–04, 95 S.Ct. 2254 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Simply put, the purpose of the test is to determine whether the "causal chain" between the Fourth Amendment violation and the statement has been broken. The four factors are: (1) the presence or absence of warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) the temporal proximity of the Fourth Amendment violation and the confession; (3) the presence of intervening circumstances; and (4) the need to deter the official misconduct. *See Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254 (discussing factors). Although these factors are not a perfect fit with the circumstances of a *McLaughlin* violation, they are an adaptable and instructive means of analyzing the attenuation of the causal links. Here, each of the four factors weighs in favor of suppression, especially the fourth factor-deterrence-which is deemed to be "particularly important."

As an initial matter, I concur with the majority's determination that Anderson's incriminating statements were voluntary. Mr. Anderson was lawfully arrested, given his *Miranda* rights, later consented to questioning and waived his *Miranda* rights, and spoke without coercion.[2] But

---

**2.** I believe that Mr. Anderson's statement that "silence is [a] virtue" effectively invoked his right to silence—even temporary silence. This does not call into question the voluntari-

ness of the statements he ultimately did make. It does, however, suggest a causal link between his invocation of silence and the police decision to unreasonably detain him.

this is only a threshold question; given the voluntariness of the statements, it is necessary under *Brown* to analyze the four factors to determine whether the government has met its burden with respect to admissibility.

The first *Brown* factor is the presence or absence of *Miranda* warnings. The record demonstrates that Anderson was given *Miranda* warnings before the May 28 confession and the Flanagan interview. The record also shows, however, that Anderson took steps to exercise his right to silence when he told police "silence is virtue," and said that he would like to wait before answering questions. The delay in arraignment occurred, in large part, in order to wait out Anderson's silence until the Utah officials arrived. This factor, then, could weigh against or in favor of suppression, depending on its purpose. If the purpose of this factor is merely to assess compliance with the Fifth Amendment and *Miranda*, no violation has been found and it would weigh against suppression. This approach, however, would appear to piggyback on the threshold voluntariness inquiry, rendering it essentially duplicative of that analysis. On the other hand, if this factor aims to assess the impact of the invocation or waiver of *Miranda* rights on the connection between the Fourth Amendment violation and the confession ultimately obtained, the picture looks quite different. Although Anderson had received his *Miranda* rights, after he invoked silence[3] the officers decided to hold him (violating *McLaughlin*) until he confessed. In this case, the initial *Miranda* recitation and invocation suggest a greater, not a lesser, connection between the Fourth Amendment violation and the confession. Because the *Brown* factors

are aimed at assessing the "causal chain" between the violation and the confession, 422 U.S. at 602, 95 S.Ct. 2254, I conclude that the latter analysis applies, and that this factor weighs in favor of suppression.

The second factor is the temporal proximity between the Fourth Amendment violation and the confession. This factor carries an unusual valence in a *McLaughlin* case. In the usual *Brown* situation, an illegal arrest is followed by a later statement; thus, the passage of time weakens the causal link. *See, e.g., United States v. Crews*, 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) ("In the typical 'fruit of the poisonous tree' case, however, the challenged evidence was acquired by the police *after* some initial Fourth Amendment violation . . .") (italics in original). In a *McLaughlin* case, however, the Fourth Amendment violation is ongoing—there is no pause in which "free will" terminates the effect of the violation. The extended detention itself is a violation, which begins at an unidentified point (presumptively, no later than 48 hours after arrest) and continues through the confession. *See, e.g., State v. Huddleston*, 924 S.W.2d 666, 675 (Tenn.1996) (discussing ongoing nature of *McLaughlin* violation). Thus, the passage of time in a *McLaughlin* case *exacerbates* the Fourth Amendment violation; the longer the unreasonable detention, the greater the detention's inherent coercive effect on the confession. *See, e.g., Miranda*, 384 U.S. at 457, 86 S.Ct. 1602 (describing the custodial environment as intimidating and destructive of dignity). Anderson's detention presumptively began to violate *McLaughlin* approximately eight hours before he confessed to the Utah killings, and fifteen hours before he was

---

**3.** The majority implicitly recognizes the connection between the request for silence and the delay in arraignment and later confession, although it uses that connection to blame Anderson for the violation of his *McLaughlin* rights. Blaming Anderson is off the mark. Anderson never invited the police to hold him without a timely arraignment. He never said he wanted to talk with Utah authorities. He bears no blame for the delay occasioned by

the officer's desire to hold him pending a further investigation that was unnecessary to charging and arraigning him. Other than a series of "uh-huh's" and "ah," Anderson said only that he had "better wait and see what they got—," and "I think right now . . . silence is [a] virtue because . . . well, it's just better right now for me to wait." Waiting to see "what they got" is a far cry from professing a desire to talk.

interviewed by Dr. Flanagan. Because the *McLaughlin* violation, the confession, and the interview were contemporaneous, this factor weighs strongly in favor of suppression.

The third factor is whether intervening circumstances purged the taint of the *McLaughlin* violation. We have held that (1) a subsequent release from custody, (2) an appearance before a magistrate, (3) discussions with a lawyer, and (4) subsequent convictions on unrelated charges are examples of intervening circumstances that are sufficient to break the causal connection between the Fourth Amendment violation and the statement. *See United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1300 (9th Cir.1988). In this case, no circumstance intervened to cure the unreasonableness of the detention in the way that a release, appearance, or subsequent conviction would under *Delgadillo–Velasquez*.[4] Nor did Anderson speak to a lawyer—or anyone else—during his confinement. And although Anderson received *Miranda* warnings, it is well settled that fresh warnings cannot purge the taint of a prior—let alone an ongoing—Fourth Amendment violation. *See Brown*, 422 U.S. at 601–02, 95 S.Ct. 2254; *Dunaway v. New York*, 442 U.S. 200, 202–03 & n. 2, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (*Miranda* warnings and waiver did not constitute intervening act, even for second confession with new warnings). *See also, e.g., United States v. King*, 990 F.2d 1552, 1564 (10th Cir.1993) (defendant's voluntary confession inadmissible where given during illegal detention and no intervening circumstances to dissipate taint). If *Miranda* warnings were considered an intervening cause, this third factor would be redundant, as the threshold determination of voluntariness was predicated in large part on the *Miranda* warnings and Anderson's response. Here, the Fourth Amendment violation continued through and beyond Mr. Anderson's confession and interview. This factor too weighs in favor of suppression.

The final factor centers on whether the police misconduct in this case was purposeful and flagrant, and thus requires deterrence. This factor "is 'particularly important' because it comes closest to satisfying 'the deterrence rationale for application of the exclusionary rule.' " *United States v. George*, 883 F.2d 1407, 1416 (9th Cir.1989) (quoting *United States v. Perez Esparza*, 609 F.2d 1284, 1289 (9th Cir.1979)). The relevant conduct is not the police behavior surrounding the confession, but the detention without determination of probable cause. The record demonstrates that the police intentionally detained Anderson while awaiting the arrival of police from Utah who would interview Anderson about the Utah killings. As noted above, the state was unable to provide any valid reason for the delay.

The question, then, is whether this situation meets the purposes of the exclusionary rule. It seems clear that it does. As the Tennessee Supreme Court explained in a case very similar to this one,

> Ignoring the requirements of *McLaughlin* is functionally the same as making warrantless searches or arrests when a warrant is required. In both situations, law enforcement officials act without necessary judicial guidance or objective good faith. The cost of applying the exclusionary sanction to a violation of *McLaughlin* is that evidence obtained as a result of the illegal detention will be suppressed ... It will deter law enforcement officials from ignoring the Fourth Amendment mandate of a judicial determination of probable cause.

*Huddleston*, 924 S.W.2d at 673. Likewise, suppression of Anderson's confession and interview would deter law enforcement officers in future cases from delaying arraignment without a bona fide emergency or other extraordinary circumstance. Delay solely for investigative purposes has been held to be altogether illegitimate.

---

**4.** A volunteered confession cannot constitute a sufficient intervening circumstance. The kinds of circumstances noted in *Delgadillo–* *Velasquez* cure the illegality of the detention under the Fourth Amendment. A volunteered confession does no such thing.

Indeed, in the analogous context of Federal Rule of Criminal Procedure 5(a), which requires an initial appearance without unreasonable delay, it has been held that the "desire of the officers to complete the investigation is, perhaps, the most unreasonable excuse possible...." *United States v. Wilson*, 838 F.2d 1081, 1085 (9th Cir. 1988). Cf. *United States v. Van Poyck*, 77 F.3d 285 (9th Cir.1996) (holding, in a Rule 5 case, that the absence of intentional postponement for interrogation means no public policy issue). *McLaughlin* itself specifically characterized as "unreasonable" a delay "for the purpose of gathering additional evidence to justify the arrest." 500 U.S. at 56, 111 S.Ct. 1661.

Now that the Supreme Court has laid down a bright-line 48–hour rule under *McLaughlin*, law enforcement officials need not split hairs to determine the deadline for arraignment. And while I am sympathetic to certain circumstances that might warrant a delay in arraignment, such as geographic or judicial logistics, this is not such a case. This is not a situation involving "unavoidable delay[ ] in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy ... or securing the premises of an arrest, and other practical realities." *Id.* Here, no such legitimate explanation excuses the officers' conduct. The flagrancy of the violation, and the unreasonableness of the feeble justification, tip this factor strongly in favor of suppression. Precisely this situation has been recognized by the Seventh Circuit to support suppression. *See Kyle v. Patterson*, 196 F.3d 695, 696–97 (7th Cir.1999) ("There are certain exceptions to [the 48 hour] rule, but none are applicable here ... *[T]he remedy for a violation of the failure to provide a prompt hearing is usually the suppression of any statements the accused gives to police after the time expires and before the first appearance in court.*") (emphasis added) (addressing *McLaughlin* violation in § 1983 case).

In sum, police unreasonably detained Mr. Anderson for the most objectionable of reasons—to await a confession without being interrupted by a lawyer or a judge. They did so in order to enhance the case for the penalty phase and because Mr. Anderson chose to be silent. In the end, Anderson's invocation of the "silence is a virtue" maxim triggered his unreasonable detention. If *Gerstein* and *McLaughlin* have practical meaning with respect to the Fourth Amendment, this violation of Mr. Anderson's rights requires a remedy. Under *McLaughlin* and *Brown*, the statements must be suppressed.

## II. THE MAJORITY SIDESTEPS *BROWN*

The majority arrives at a different conclusion. Although it rejects a pure voluntariness test in favor of *Brown*'s "fruit of the poisonous tree" inquiry, it unfortunately allows the voluntariness issue to permeate nearly every part of its analysis. The majority concedes that the second *Brown* prong, temporal proximity, is met. But it holds that a single element—that Anderson willingly confessed to the Utah murders—resolves the threshold voluntariness question, demonstrates *Miranda* compliance, suffices as an intervening circumstance, and shows that suppression will not deter. In so doing, the majority falls prey to what the Supreme Court called "a lingering confusion between voluntariness for purposes of the Fifth Amendment and the 'causal connection' test established in *Brown*." *Dunaway*, 442 U.S. at 219, 99 S.Ct. 2248. Voluntariness under the Fifth Amendment is simply not cognizable as one of the four *Brown* factors under the Fourth Amendment: "Satisfying the Fifth Amendment is only the threshold condition of the Fourth Amendment analysis required by *Brown*. No intervening events broke the connection between petitioner's unreasonable detention and his confession. To admit petitioner's confession in such a case would allow law enforcement officers to violate the Fourth Amendment with impunity,

safe in the knowledge that they could wash their hands in the procedural safeguards of the Fifth." *Id.* (internal quotation marks omitted).

The majority is able to leverage Anderson's willing confession this way by focusing on a purported "decision to confess," ignoring this court's jurisprudence on intervening circumstances, and by attributing the *McLaughlin* violation to the actions of the prisoner.

First, the majority concludes that when Anderson halted the interview, he had actually decided to confess at some later date. According to the majority, such a decision, if it occurs (presumably in the mind of the detainee?) before the constitutional violation, is an "intervening circumstance" under the third *Brown* prong. This hopscotch logic has no factual or legal support. The majority draws its inference from a hopeful reading of Anderson's words during the 7:04 interview,[5] and from a description of a purported jailhouse deal by which Anderson would confess to the Utah crimes if he were ever caught. But even if he decided to confess years before while in Utah prison, so what? The majority does not—and can not—point to any authority to support the proposition that a "decision to confess" intervenes to insulate a *McLaughlin* violation from review.[6] Tellingly, the majority does not cite to a single case stating that a volunteered confession suffices as an "intervening circumstance" under *Brown*. As noted above, this court has held that release from custody, appearance before a magistrate, dis-

cussions with a lawyer, and subsequent convictions on unrelated charges are examples of intervening circumstances. A decision to confess is not. In fact, when presented with cases in which a confession intervened, courts have failed to find this an adequate "intervening circumstance" under *Brown*. See *Dunaway*, 442 U.S. at 203 n. 2 & 219, 99 S.Ct. 2248 (suppressing second statement where police arrested without probable cause, Mirandized, questioned defendant, Mirandized, and questioned again); *King*, 990 F.2d at 1564.

The majority discusses at length its belief that suppression in this case would not deter future *McLaughlin* violations. In particular, the majority concludes that the officers did not intend to violate *Gerstein*[7] or *McLaughlin*, but that Anderson made them do so by waiting so long to confess. Somehow, the majority has blamed Anderson for his own, clearly unconstitutional, 76–hour detention. The majority concludes that "[t]his delay was attributable to Anderson's behavior and desires, not to any misconduct on the part of any law enforcement officials. Anderson was the one who wanted to wait, *not* the deputies; and it was his request for delay that caused the confessions to occur during his extended detention." (emphasis in original). It is not immediately clear what this is intended to prove. If the contention is that Anderson's unwillingness to confess promptly caused the Fourth Amendment violation, this conclusion is surely untenable; it cannot seriously be argued that a

---

5. The majority concludes that, when Anderson stopped the 7:04 interview, he had actually bound himself to confess at a future time. But as the majority's narrative of the facts sets out, Anderson could well have been invoking his rights. Mentioning "what you told me" and "somethin' clicked when you was talkin' "—which appear to refer to the rights the police officers had just read him— Mr. Anderson finally said "silence is [a] virtue because ... well, it's just better right now for me to wait." Although he did not use the language of a lawyer, it is no stretch to conclude that Mr. Anderson invoked his right to silence—even if temporary silence—at the time of that interview.

6. The majority focuses on the decision to confess, rather than the confession itself. This distinction is not merely semantic; only by focusing on the decision to confess can the majority truthfully say that the purportedly intervening conduct occurred before Anderson's detention or "while his detention was legal," because the actual confession came 56 hours after arrest, long after the detention without probable cause determination had matured into a violation of the Fourth Amendment.

7. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

defendant is to blame for the state's failure to ensure a prompt determination of probable cause, nor, worse still, that the failure to waive one's Fifth Amendment rights justifies a breach of Fourth Amendment rights. However the majority chooses to characterize the situation, the fact remains that Anderson did not confess until after the police had held him in violation of the Fourth Amendment.

The majority concludes that there was nothing here to deter, because *McLaughlin* was decided only after the detention had taken place, but was not "a specific rule on the books at the time." But long .before *McLaughlin* established a bright-line rule, *Gerstein* was "on the books" and held that an unreasonable delay in arraignment was unconstitutional. The delay here was more than unreasonable, particularly because it was motivated by an improper investigatory purpose. To suggest now that the passage of time should shield law enforcement officers from a remedy that invokes deterrence simply compounds the error. The deterrence factor speaks not just to the individual officers in this case, but to the integrity of the system as a whole.

The majority further reasons that it makes little sense to consider deterrence twenty years after the fact of the detention. This analysis misunderstands the purpose of the deterrence factor. The proper question is not whether these particular officers will be deterred after the fact—which, of course, they will not—but whether suppression will deter future misconduct. Considered in this light, the deterrence factor applies here with great force. The illegal detention led directly to the confession. Moreover, the illegal detention was based on the most impermissible of motives—the police unreasonably kept Anderson because they hoped that he would confess to the Utah police, despite the fact that he had stopped speaking about Utah during the initial, legal portion of his detention. This improper motive, combined with the coercive effect of incarceration—and its resulting isolation from

lawyers and judges—suggests that there is plenty here to deter.

The record shows that Mr. Anderson said he would not speak, at least until the Utah officials appeared. The police were willing to illegally detain Anderson at least until then, and longer, if it would guarantee his confession, regardless whether a probable cause determination had been made. This the Constitution forbids.

## III. THE ERROR WAS NOT HARMLESS ·

Constitutional error at trial is harmless on habeas review unless it had a substantial and injurious effect or influence on the verdict. *See Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Sassounian v. Roe,* 230 F.3d 1097 (9th Cir.2000). If the issue is evenly balanced, and the court has grave doubts about whether the error sufficiently affected the verdict, then the court must rule for the petitioner. *See O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Without Anderson's confession of May 28, and the psychiatrist's testimony derived from the interview, the penalty case against him would have been gutted. And even with the damning evidence (which should have been suppressed), the· jury deliberated for 21 days. Indeed, the prosecutor stated that without the confession, the possibility that Anderson would have been charged with a capital offense at all would be dramatically lower. Other than Anderson's confession on May 28, the prosecution offered little evidence to link Anderson to the Utah killings. He was never charged with these offenses, and the state's evidence on those killings was highly problematic at best. Recognizing the jury's obligation to consider an unadjudicated offense as an aggravating circumstance only if the offense is proven beyond a reasonable doubt, *State v. Robertson,* 33 Cal.3d 21, 53–55, 188 Cal.Rptr. 77, 655 P.2d 279 (1982), it requires no leap of logic to conclude that the error was far from harmless. The prosecution's reliance on

the Utah killings as aggravating factors is evident from the record. It is impossible to conclude that the admission of the confession did not have a substantial and injurious effect on the penalty phase.

In addition to the confession, the state presented at the penalty phase Dr. Flanagan's testimony about Anderson's behavior and personality, based on his interview with Anderson during the illegal detention. The majority concludes that, because Anderson did not present a defense of diminished capacity or mental illness, Dr. Flanagan's testimony was insignificant. The absence of a defense, however, only renders more prejudicial the unrebutted testimony depicting Anderson as a sociopath who could not likely be rehabilitated. How the unreasonable detention affected Anderson's statements in the interview cannot be known, but by the time Dr. Flanagan interviewed Anderson, he had been detained for approximately 63 hours, kept in isolation, fed a restricted diet, and deprived jail privileges. Dr. Flanagan's testimony was the only evidence presented on Anderson's psychological make-up.

Taken together, the confession and the interview with Dr. Flanagan constitute evidence that may have had a substantial and injurious effect on the penalty phase. The state has not demonstrated that the Fourth Amendment violations were harmless under the *Brecht* standard. Therefore, I would reverse the penalty phase of Anderson's trial.